Martin A. TAYLOR and Sarah Taylor,

v.

Morton WACHTLER, Walker Jewelry Co., Inc. and M. Wachtler & Sons, Inc.

Civ. A. No. 92–4509.

United States District Court, E.D. Pennsylvania.

June 24, 1993.

FINDINGS OF FACT AND
CONCLUSIONS OF
LAW

BRODY, District Judge.

## I. *Introduction*

The plaintiffs brought this lawsuit seeking an accounting of the defendants' sales of plaintiffs' jewelry, any amounts due plaintiffs as a result of this accounting, the return of any unsold pieces of plaintiffs' inventory and attorneys fees and costs. The parties in this case are jewelers and owners of jewelry businesses.

In 1989, the plaintiffs, suffering from poor health, decided to close their jewelry business. They sought the defendants' assistance. Now the parties dispute whether they entered into a consignment agreement whereby defendants would sell plaintiffs' jewelry inventory on consignment. During a bench trial, I heard evidence from the plaintiffs that the transaction at issue was a consignment and from the defendants that the transaction was not a consignment but a sale. The issue now before me is whether this evidence of the parties' conduct and intent supports a finding that they entered into a consignment arrangement. I find that it does not and as a result that plaintiffs are not entitled to an accounting or to recover the costs and fees associated with this action.

## II. *Findings of Material Fact*

1. The plaintiffs, Martin A. Taylor and Sarah Taylor, owned and operated a jewelry business, incorporated as Martin A. Taylor Company, Inc., at 1015 Chestnut Street, Philadelphia, Pennsylvania for forty-four (44) years. (N.T. Taylor at 7–8.) [1]

2. Mrs. Taylor worked in the office, the "interior," and knew most of the customers. Mr. Taylor traveled around the country and met with salespeople. (N.T. Taylor at 14.)

3. Taylor Inc. primarily conducted business with the Post Exchanges for the United

Peter Hearn, Philip Y. Lin, Pepper, Hamilton & Scheetz, Philadelphia, PA, for plaintiff.

Charles I. Richman, Richman & Rudnick, P.C., Philadelphia, PA, for defendant.

1. The plaintiffs' complaint does not identify Martin A. Taylor Co., Inc. ("Taylor Inc.") as a plaintiff, however, at trial both parties treated Taylor Inc. as if it was a plaintiff alongside the individual plaintiffs. Because the parties treated Taylor Inc. as if it was one in the same as the Taylors themselves, I treat Taylor Inc. in the same way.

States Army, Air Force, Navy and Marine Corps. (N.T.M. Taylor at 8.)

4. Taylor Inc. did not cater to individual retail customers. (N.T. Taylor at 8.)

5. From 1970 to 1985, the peak years of business for Taylor Inc., it employed ten to twelve people on the premises and another twelve salespeople working on commission. (N.T. Taylor at 12–13.)

6. Mr. Taylor maintained inventory records which identified each piece of jewelry he had. (N.T. Taylor at 10.)

7. At the end of each year, Mr. Taylor physically inventoried his stock. (N.T. Taylor at 9–10.)

8. With the exception of his more valuable jewelry, Mr. Taylor kept a stock record card for each piece of inventory. On each stock record card he recorded information particular to that piece of jewelry including the price he paid for the piece, the type of merchandise it was and the quantity of that merchandise he had in stock. (N.T. Taylor at 10.)

9. Mr. Taylor maintained separate record cards for his more valuable items, like diamonds larger than one-half carat. On these cards he recorded information about each piece including its weight, clarity and color. (N.T. Taylor at 10–11.)

10. Taylor retained records of each purchase or sale of jewelry for seven years. (N.T. Taylor at 12.)

11. Also, each year Mr. Taylor or someone in his office would fill out a proposal for a jeweler's block policy insurance coverage for Taylor, Inc. (N.T. Taylor at 82–83.)

12. Mr. Taylor reviewed these insurance proposals before signing them. (N.T. Taylor at 82.)

13. The defendants, Morton Wachtler ("Wachtler"), Walker Jewelry Company, Inc. ("Walker") and M. Wachtler and Sons, Inc., ("MWS") are engaged in the wholesale and retail jewelry business in New York City. (N.T. Wachtler at 62–64.)

14. Walker, located at 50 West 47th Street, buys and sells jewelry at wholesale prices. (N.T. Wachtler at 63.)

15. MWS engages in both wholesale and retail purchases and sales of jewelry. Approximately ten to fifteen percent (10–15%) of its business is retail. MWS conducts business at 8 West 47th Street. (N.T. Wachtler at 63.)

16. Taylor Inc. closed its business in 1989.

17. During the three years preceding the close of their business, Mr. and Mrs. Taylor and one of their employees suffered from debilitating medical problems. Mrs. Taylor became ill with emphysema. (N.T. Taylor at 13.) She did not return to the business. (N.T. Taylor at 14.)

18. Shortly after Mrs. Taylor became ill, Benjamin Miller, Mr. Taylor's brother-in-law and the store manager, also became ill and was unable to actively participate in the business. (N.T. Taylor at 14.)

19. Finally, during this same period, Mr. Taylor became depressed and despondent. (N.T. Taylor at 14.) In addition, he learned that he suffered from several health problems including a heart ailment and diabetes. (N.T. Taylor at 15.)

20. In early 1989, because of their deteriorating health, the Taylors decided to give up their jewelry business. (N.T. Taylor at 15, 58.)

21. Mr. Taylor did not have a specific plan for closing the business. (N.T. Taylor at 15.) At first he thought of scaling the business back and operating it on a smaller scale. (N.T. Taylor at 15.) Then, he decided to completely wind down the business. (N.T. Taylor at 15–16.) Mr. Taylor made the decision to close his business a few months before contacting Mr. Wachtler. (N.T. Taylor at 58.)

22. Approximately six months before contacting Mr. Wachtler, Mr. Taylor invited David Atlas to look at his inventory for the purpose of purchasing it. (N.T. Taylor at 133–35.)[2]

2. Mr. Atlas first learned of the problems between Mr. Taylor and Mr. Wachtler in August 1992

even though Mr. Taylor and Mr. Atlas saw each other socially on at least one occasion since the

23. Mr. Atlas could not afford to purchase all of Taylor's inventory, rather, he only wanted to "cherry pick" certain pieces. (N.T. Taylor at 133–34.)

24. In May 1989, Mr. Taylor telephoned Mr. Wachtler. (N.T. Taylor at 16; N.T. Wachtler at 64.)

25. He called Mr. Wachtler because he had a lengthy business relationship with Mr. Wachtler and Mr. Wachtler's now deceased partner, George Altman, and because Mr. Wachtler's firm was experienced in liquidating jewelry merchandise. (N.T. Taylor at 16; N.T. Wachtler at 64.) Although the parties had done business for many years, Mr. Taylor had never before consigned goods to Walker. (N.T. Taylor at 91.)

26. Mr. Taylor told Mr. Wachtler that because he, his wife and his brother-in-law were in poor health he wanted to liquidate his business. (N.T. Taylor at 17; N.T. Wachtler at 64.) Mr. Taylor asked Mr. Wachtler to look over and purchase the merchandise. (N.T. Wachtler at 64.)

27. Mr. Wachtler agreed to visit Taylor, Inc. within the next week to ten days from the time of Mr. Taylor's telephone call. (N.T. Taylor at 17.)

28. On May 23, 1989, Mr. Wachtler visited Taylor, Inc. and met with Mr. Taylor. (N.T. Taylor at 17; N.T. Wachtler at 65.)

29. Mr. Wachtler arrived at Taylor, Inc. between 11:00 and 11:30 A.M. (N.T. Taylor at 17; N.T. Wachtler at 65.)

30. Mr. Wachtler asked to see Taylor Inc.'s merchandise and showed particular interest in the diamond inventory. (N.T. Taylor at 17–18; N.T. Wachtler at 65.)

31. Mr. Wachtler spent between four and five hours viewing Mr. Taylor's inventory. (N.T. Taylor at 18.)

32. At the end of the day, Mr. Taylor asked Mr. Wachtler for $1,000,000 or $1,100,000 for his inventory. (N.T. Wachtler at 65.) Mr. Wachtler did not agree to sell Mr. Taylor's inventory on consignment. (N.T. Wachtler at 70, 100–01.)

1989 transaction at issue in this lawsuit. (N.T.

33. Before loading his car with jewelry, Mr. Wachtler suggested that he sign a memorandum. (N.T. Wachtler at 66.) Mr. Wachtler prepared and signed a memorandum, on one of Mr. Taylor's forms, entitled "MEMORANDUM" specifying "1 lot of jewelry" and stating a figure of $950,000. (N.T. Wachtler at 65–66; N.T. Taylor at 22, 73; Exhibit P–5.) The boilerplate language of this memorandum states:

> The merchandise described herein is consigned only. It is received by the consignee upon the express agreement that the title to the merchandise used to the proceeds thereof to the extent of the within invoiced prices shall be and remain in the consignor, until the actual payment of the invoiced prices. (Exhibit P–5.)

In addition, at the bottom of the memorandum is further boilerplate language stating:

> I accept and hereby acknowledge the receipt of the above goods upon the conditions above set forth, and upon the conditions that the title thereto shall remain with the above named and I am to return the same to them on demand. (Exhibit P–5.)

Following this language is a signature line. While Mr. Wachtler signed this memorandum underneath the handwritten portion stating one lot of jewelry, he did not sign this signature line. (Exhibit P–5.)

34. The $950,000 figure represented a "ballpark figure" for the value of the entire inventory and was used for insurance purposes in case the jewelry was lost, stolen or damaged while in Mr. Wachtler's possession. (N.T. Wachtler at 67–68.)

35. This memorandum came from a book of forms in Mr. Taylor's possession. (N.T. Taylor at 22–23.)

36. Mr. Wachtler signed the memorandum for insurance purposes: to show that he was liable for the jewelry in the event of a robbery, accident or other loss. (N.T. Taylor at 23; N.T. Wachtler at 66–68.)

37. Mr. Wachtler was free to take all of the Taylor inventory back to New York with him. (N.T. Taylor at 72.)

Atlas at 215.)

38. However, Mr. Wachtler drove a Jaguar sedan to Philadelphia on that day. (N.T. Wachtler at 68; N.T. Taylor at 20.) Thus, he could only take two sample jeweler's cases filled with inventory back to New York with him that day because that is all that would fit in his car. (N.T. Taylor at 20, 72; N.T. Wachtler at 68.) Mr. Wachtler's car was not large enough to transport all of Mr. Taylor's jewelry at one time. (N.T. Hammond at 163–64.) The contents in these two jeweler's cases represented approximately half the value of Mr. Taylor's inventory. (N.T. Taylor at 29.)

39. The two jeweler's cases filled Mr. Wachtler's car. (N.T. Wachtler at 68.)

40. The parties further agreed that Mr. Taylor would deliver the balance of his inventory to Mr. Wachtler in New York. (N.T. Wachtler at 115; N.T. Taylor at 68–69.)

41. Mr. Wachtler also asked to take Mr. Taylor's inventory records with him. (N.T. Taylor at 20.) Mr. Wachtler wanted and actually used these records to verify the amount of merchandise he received from the Taylor inventory. (N.T. Wachtler at 85.)

42. Mr. Taylor did not make copies of his inventory records before Mr. Wachtler arrived. (N.T. Taylor at 65.) On that day, Mr. Taylor's photocopy machine was broken so he did not make copies of his inventory records. (N.T. Taylor at 20.) Even though Mr. Taylor testified that it would have been logical for him to make copies of all his records before giving them to Mr. Wachtler, he also testified that he did not copy his records before Mr. Wachtler arrived because:

Q: Is there any reason why you didn't make copies of your inventory records prior to Mr. Wachtler coming up in May?

A: I had no reason to. I didn't know that I was going to give it to anybody.

Q: You don't think that if you sold or somehow transferred your goods on consignment or any other way that that person would need your inventory sheets?

A: If that was going to be done, counselor, I would have been prepared for it. But since I had no indication that anything like that would occur, I didn't want to make a

duplicate copy. I didn't have to. (N.T. Taylor at 65.)

Consequently, Mr. Taylor gave Mr. Wachtler his original inventory records as of the end of 1988. (N.T. Taylor at 21.)

43. Mr. Taylor testified that he did not make a list of the inventory Mr. Wachtler took with him that day because it was 5:30 or so that evening and too late to start making such a list. (N.T. Taylor at 90.) I find that under the circumstances this is an unlikely explanation.

44. Mr. Wachtler was to make copies of these records and return them to Mr. Taylor. (N.T. Taylor at 25.)

45. At no time during the course of this transaction did the parties discuss the amount or payment terms of any commission Mr. Wachtler was to receive for selling Mr. Taylor's inventory. (N.T. Taylor at 55.)

46. During the course of this transaction, Mr. Taylor never filed a security statement in New York under Article 9 of the Uniform Commercial Code. (N.T. Taylor at 92.)

47. Mr. Taylor did not require Mr. Wachtler to get his permission before selling a piece of his inventory. (N.T. Taylor at 92.)

48. Mr. Taylor imposed no minimum prices on his inventory. (N.T. Taylor at 92.)

49. Mr. Taylor did not require Mr. Wachtler to separately identify his jewelry from Mr. Wachtler's own inventory. (N.T. Taylor at 94.)

50. Mr. Taylor did not require Mr. Wachtler to keep from mingling his inventory with Mr. Wachtler's own inventory. (N.T. Taylor at 94.)

51. Mr. Taylor did not require Mr. Wachtler to bill purchasers of Mr. Taylor's jewelry on Mr. Taylor's own invoices. (N.T. Taylor at 95.)

52. Customers purchasing jewelry from the Taylor inventory were billed on Wachtler's invoices. (N.T. Wachtler at 88.)

53. The parties had no agreement as to who would bear the loss if a customer failed to pay Mr. Wachtler for a piece of Mr. Taylor's inventory. (N.T. Taylor at 109.)

54. Mr. Taylor did not require Mr. Wachtler to establish a separate bank account in order to keep separate the monies he received for the sale of Mr. Taylor's inventory. (N.T. Taylor at 95.)

55. On May 30, 1989, Mr. Taylor telephoned Mr. Wachtler's place of business and spoke with Norman Goldberg, manager of Walker. (N.T. Goldberg at 41–42, 45.) Mr. Taylor informed Mr. Goldberg that he would be coming to New York the next day. (N.T. Goldberg at 45; N.T. Taylor at 69.) Mr. Goldberg told Mr. Taylor that Mr. Wachtler was out of town and would not be available on May 31, 1989. (N.T. Goldberg at 45.)

56. Mr. Taylor was not concerned that Mr. Wachtler would not be present when he delivered the balance of his inventory. (N.T. Taylor at 69.)

57. On May 31, 1989, Mr. Hammond, Mr. Taylor's driver, took Mr. Taylor and the balance of his inventory, in twelve or thirteen jeweler's sample cases, except for several diamonds, to Mr. Wachtler's place of business in New York City. (N.T. Taylor at 25–29.)

58. Mr. Taylor purchased an insurance policy stating "$275,000. excess of $25,000. ultimate net loss" for the jewelry he was transporting to New York. (Exhibit D–11K.)

59. Mr. Taylor kept six to eight certificate diamonds worth approximately $20,000. (N.T. Taylor at 29, 77.)

60. When Mr. Taylor reached Mr. Wachtler's place of business, he told Mr. Goldberg that he had the rest of the jewelry with him and Mr. Goldberg sent several employees out to unload the jewelry. (N.T. Taylor at 27.)

61. Mr. Taylor did not use the word "consignment" in his discussions with Mr. Goldberg that day. (N.T. Taylor at 91–2.)

62. Mr. Taylor remained at Mr. Wachtler's place of business for about one hour. (N.T. Taylor at 28.)

63. Mr. Taylor and Mr. Goldberg did not exchange any papers, writings or signed documents on May 31, 1989. (N.T. Taylor at 29–30; N.T. Goldberg at 45.) Mr. Taylor did not ask for or get any signed receipt for the jewelry he delivered. (N.T. Taylor at 66–67.)

64. Prior to delivering the balance of his inventory, Mr. Taylor did not make a list of the items he was turning over to Mr. Wachtler. (N.T. Taylor at 65–66.) Mr. Taylor did not ask for the return of his inventory records. (N.T. Taylor at 68.)

65. On the very next day, June 1, 1989, Mr. Taylor canceled his jeweler's block policy of insurance even though he knew at the time that if the transaction with Mr. Wachtler was a consignment then he, as the consignor, would retain title of the jewelry while it was in Mr. Wachtler's possession. (Exhibit D–27; N.T. Taylor at 77–78.)

66. On June 13, 1989, Mr. Taylor returned to New York. (N.T. Taylor at 30, 35.) He did not bring any blank invoices with him because he only sent invoices after a transaction was completed. (N.T. Taylor at 104–105.)

67. During this visit, Mr. Taylor received a check for $450,000 from Mr. Wachtler's son, Jay. (N.T. Taylor at 33.) This check was signed by Mr. Wachtler. (Exhibit D–3.)

68. At this time, Mr. Taylor did not ask for a list of his inventory items which this check supposedly represented. (N.T. Taylor at 71.)

69. Mr. Wachtler testified that, on June 13, 1989, he cut and pasted together one of Taylor Inc.'s invoices in Mr. Taylor's presence to create an invoice from Taylor Inc. to him and that Mr. Taylor signed this invoice. (N.T. Wachtler at 71–72; Exhibit D–2.) This invoice states "1 lot of jewelry as per attached lists," has the figure $875,000 on it and states "paid on acct $450,000—check 5520 Bal 60 Days." (Exhibit D–2.) Mr. Wachtler testified that his now deceased secretary, Florence Stein, wrote out this invoice. (N.T. Wachtler at 72–3.) Mr. Wachtler further testified that the $875,000 figure represented a $25,000 reduction from the original purchase price of $900,000 because some of the Taylor merchandise was missing and that Mr. Taylor agreed to this reduction. (N.T. Wachtler at 74.)

70. Mr. Taylor testified that he did not see Mr. Wachtler cut and paste together this invoice and that he did not place his signa-

ture on it. (N.T. Taylor at 31–33, 102.) Mr. Lesnevich, expert for the plaintiffs, testified that the June 13th invoice did not contain Mr. Taylor's signature and that it did contain a forgery of his signature on this document. (N.T. Lesnevich at 78.) In accordance with this credible testimony, I find that the signature placed on this invoice was a forgery of Mr. Taylor's signature. In addition, in light of this forgery, I find: (a) that Mr. Wachtler's testimony about the creation of this invoice is not credible; (b) that Mr. Taylor did not witness the preparation of this invoice; and (c) that Mr. Taylor did not agree to a $25,000 reduction in price.

71. Two days after this visit, on June 15, 1989, Mr. Taylor signed a "Corporate Dissolution or Liquidation" form which indicated that Martin A. Taylor Co., Inc., as of that date, was completely liquidated or dissolved. (N.T. Taylor at 106; Exhibit D–16.)

72. Mr. Taylor again returned to Mr. Wachtler's place of business on August 14, 1989. At that time, Mr. Taylor received a check for $425,000. (N.T. Taylor at 36–37; Exhibit P–52.)

73. Mr. Wachtler's son, Jay Wachtler, signed this check. (N.T. Taylor at 37; Exhibit P–52.)

74. Upon receipt of this check, Mr. Taylor did not ask Mr. Wachtler or his son to provide him with a list of the inventory items which the check supposedly represented. (N.T. Taylor at 71.)

75. After giving Mr. Taylor this check, Mr. Jay Wachtler had James Schraeder, an employee, retrieve the June 13, 1989 invoice and then had Ms. Stein affix a "paid" stamp and write the check number 5521 on the invoice. (N.T. Schraeder at 147–48; Exhibit D–2.)

76. On August 17, 1989 Mr. Taylor executed an "Out Of Existence Affidavit" in which he stated that Taylor "ceased to transact business on or about June 15, 1989" and that all its assets were "sold, assigned or distributed on August 16, 1989." (Exhibit D–17.)

77. Finally, on September 26, 1989, Mr. Taylor again went to New York and received a check from Mr. Wachtler for $25,000. (N.T. Taylor at 38; Exhibit P–52.)

78. Mr. Taylor did not request a list of his inventory represented by this check. (N.T. Taylor at 72.)

79. Also on September 26, 1989, Mr. Wachtler gave Mr. Taylor a blank invoice and Mr. Taylor wrote out and signed this invoice. (N.T. Taylor at 113; Exhibit D–6.)

The invoice states:

Sold To Walker Jewelry Associates .... One lot of jewelry from memo dated May 23, 1989 complet (sic) lot paid in full,

and is signed "Thank you Martin A Taylor." (N.T. Taylor at 113; N.T. Wachtler at 79–80; Exhibit D–6.) This invoice is for $25,000. (Exhibit D–6.)

80. Mr. Wachtler dictated the language of this invoice although it was Mr. Taylor's idea to write "thank you". (N.T. Taylor at 113.) Mr. Taylor testified that he was angry and "felt like blowing my brains out" because Mr. Wachtler and Mr. Goldberg were so aggressive, however, he still wrote "thank you" on the invoice. (N.T. Taylor at 113.)

81. Mr. Taylor requested another $25,000 from Mr. Wachtler because he had delivered another $5,000 to $6,000 worth of jewelry to Mr. Wachtler. (N.T. Wachtler at 76–77.)

82. Mr. Wachtler decided to pay Mr. Taylor the $25,000 because he wanted to maintain a good business relationship with him. (N.T. Wachtler at 77.) 76.

83. Between May 23, 1989 and September 26, 1989, Mr. Wachtler paid Mr. Taylor a total of $900,000 for his jewelry inventory. (N.T. Taylor at 70–72.)

84. To date, Mr. Taylor has not paid Mr. Wachtler a fee or commission for selling the jewelry nor has he made any arrangements to do so. (N.T. Taylor at 70.) To date, Mr. Wachtler has never asked for or demanded a fee or commission for selling the Taylor inventory. (N.T. Taylor at 72.)

85. Mr. Taylor received three checks from Mr. Wachtler; none was accompanied with a list of the inventory sold or other type of accounting. (N.T. Taylor at 71.) When Mr. Taylor received these checks he did not

request any such inventory lists from defendants. (N.T. Taylor at 70–72.)

86. Following the completion of this transaction between Mr. Wachtler and Mr. Taylor the two continued to do business with each other. (N.T. Wachtler at 81; Exhibits D–12, D–13 and D–14.)

87. For example, Mr. Taylor wanted to purchase a pin for his wife's birthday and he knew that Walker carried the type of merchandise he wanted to buy. (N.T. Taylor at 52.)

88. On September 28, 1989, Mr. Taylor took, or had mailed to him, from Walker a pin with a value of more than seventeen hundred dollars. (N.T. Taylor at 52–53; Exhibit D–14.)

89. On September 28, 1989, a consignment agreement memorandum for this pin was prepared on a Walker form. (Exhibit D–14.) This consignment memorandum stated:

> This merchandise described below is received on consignment only. In accordance with the terms and conditions which appear on the back of this Memorandum and are part of this Consignment Memorandum Agreement. (Exhibit D–14.)

90. Then, on October 16, 1989, Mr. Taylor completed his purchase of the pin when he paid for it. (N.T. Taylor at 53–54; Exhibit D–13.)

91. In the jewelry business, when a potential purchaser, like Mr. Taylor on September 28th, takes a piece of jewelry "on consignment" and then decides to keep it, the "consignor" or "seller" issues an invoice which the purchaser then pays. (N.T. Taylor at 122–23.) Once the seller issues the invoice and payment has been made then the "consignment arrangement" ceases to exist. (N.T. Taylor at 122–23.)

92. In December 1989, Walker performed some repair work on a piece of jewelry for Mr. Taylor. (Exhibit D–12; N.T. Taylor at 123.)

93. Because Mr. Taylor wanted his original inventory records returned, between November 21, 1989 and October 25, 1991, Mr. Taylor made thirty-two (32) telephone calls to Walker. (Exhibit P–50; N.T. Taylor at 39.) Many of these phone calls were made from the Taylor's home. (N.T. Taylor at 44–46; Exhibit P–50.) Some of the calls were made from another jewelry store owned by George Zarat, a friend of Mr. Taylor's. (N.T. Taylor at 44–46; Exhibit P–50.) The plaintiffs did not call Mrs. Taylor, who was in the courtroom for the entire trial, or Mr. Zarat to corroborate Mr. Taylor's testimony as to the subject matter of any of these telephone calls.

94. According to Mr. Taylor, after placing one of these telephone calls, he would ask to speak with Mr. Wachtler and if he was not available then he would ask to speak to Mr. Goldberg. (N.T. Taylor at 47–48.) Mr. Taylor could not recall when he actually reached Mr. Wachtler by telephone to discuss the return of his inventory records. (N.T. Taylor at 49.)

95. Mr. Taylor engaged an attorney, Louis Lipschitz, to help him retrieve his inventory records. Mr. Lipschitz sent a letter to Mr. Wachtler on December 26, 1991 which requested the return of the inventory records. (Exhibit D–8.)

96. Mr. Wachtler's attorney, Morris Ehrlich, responded by letter in which he stated that the inventory records were not available. (Exhibit D–9.)

97. Mr. Lipschitz again inquired by letter as to the whereabouts of Mr. Taylor's inventory records. (Exhibit D–10.)

98. It later became known that Mr. Schraeder, a Walker employee, threw away Mr. Taylor's inventory records. (N.T. Wachtler at 84; N.T. Schraeder at 149–50.)

99. The plaintiffs then filed this lawsuit alleging that the agreement between the parties was a consignment and seeking an accounting, the return of any remaining pieces of their inventory, any money due them as a result of the accounting and fees and costs. (Exhibit P–1.)

100. Prior to the initiation of this lawsuit, Mr. Taylor did not recall telephoning and never wrote Mr. Wachtler seeking an accounting. (N.T. Taylor at 119.)

## III. Conclusions of Law

1. During the pretrial conference for this case, I held: (a) that Pennsylvania conflict of law rules apply to my determination of whether Pennsylvania or New York law applies to this case and (b) that Pennsylvania law applies to the issue of whether this agreement between the parties concerning the Taylor inventory was a sale or a consignment. (N.T. Pretrial Conference at 14–15.)[3]

2. The Taylors claim that they entered into a consignment arrangement with the defendants. The defendants claim that the Taylors sold their jewelry inventory outright. The Taylors, as the claimants, bear the burden of proving that the agreement between the parties was a consignment and not a sale. *In re Wells*, 140 F. 752, 754 (M.D.Pa.1905). 2 Alphonse m. Squillante & John R. Fonseca, *The Law of Modern Commercial Practices* § 11:14 at 639 (revised ed. 1981).

3. Whether the parties labeled their agreement as a consignment or a sale is irrelevant. "There is no particular magic in the term 'consigned' or 'consigned account.'" *Wells*, 140 F. at 752; *Peek v. Heim*, 127 Pa. 500, 17 A. 984, 985 (Pa.1889).

4. The intent of the parties controls as to whether an agreement is a consignment. *Wells*, 140 F. at 752; *Tax Review Board v. Elster & Prager*, 406 Pa. 543, 178 A.2d 611, 612 (1962); *see also Sales & Bulk Transfers Under the Uniform Commercial Code*, Benders U.C.C. Service, Duesenberg & King, 1990, Section 11.03 pages 11–13—11–14.

5. To determine the parties' intent, I must look at the facts surrounding the transaction. *Tax Review*, 178 A.2d at 612. Of key importance in this inquiry is whether title to the goods remains with the consignor while the consignee takes possession of the goods. *Id.*

6. A consignment arrangement exists when one party puts his or her goods in the hands of another so that they may be sold on his or her account thereby creating a principal/factor or consignor/consignee relationship. *Wells*, 140 F. at 752. Usually, a consignment agreement contains clauses providing: (a) that the consignor retains title to the goods; (b) that the consignee takes possession of the goods until they are sold; (c) that once the goods are sold title goes to the purchaser; (d) that upon selling the goods the consignee must remit the proceeds to the consignor; (e) that the consignee may retain a portion of the proceeds as a commission; (f) that if the consignee is unable to sell the goods they may be returned to the consignor; (g) the price at which the goods will be sold; (h) that the consignor's goods are to be separated or segregated within the consignee's place of business; and (i) that consignor reserves the right to inspect the consignee's premises or the consignee's business records. 2 Alphonse M. Squillante & John R. Fonseca, *The Law of Modern Commercial Practices* § 11:9 at 630 (revised ed. 1981)

7. An agreement of sale exists when one party turns goods over to another and that second party sells them as his own and is liable to the first party only for the price of the goods. *Id.* at 752.

8. At times, parties to a sale contract may include an extra condition—that title will not pass from seller to buyer until buyer pays for the goods. This restriction does not

---

**3.** In diversity actions such as this one, this Court must apply the conflict of law rules which prevail in Pennsylvania to determine whether New York or Pennsylvania laws apply to this case. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Reading Metal Craft Co. v. Hopf Drive Associates*, 694 F.Supp. 98, 103 (E.D.Pa.1988). Pennsylvania applies a "flexible conflicts methodology" to contract actions. *Melville v. American Home Insurance Co.*, 584 F.2d 1306 (3d Cir.1978); *Reading Metal*, 694 F.Supp. at 103. This means that the place which has the most interest in the action and which is most connected to it dictates that the law of its forum applies.

*Reading Metal*, 694 F.Supp. at 104. When determining which forum's law applied, I considered "the places of negotiation, contracting, and performance, the location of the subject matter of the contract, and the citizenship of the parties." *Reading Metal*, 694 F.Supp. at 104. As more specifically outlined above, Mr. Taylor and his business were in Pennsylvania. Mr. Wachtler came to Pennsylvania to view Mr. Taylor's merchandise. The parties entered into their agreement in Pennsylvania. These factors indicate that Pennsylvania is most interested in this action and therefore that its laws apply to my determination of the nature of the agreement entered into by the parties.

change a sale contract into one for consignment, rather, it merely imposes a restriction upon the sale. *Wells,* 140 F. at 752.

9. In evaluating the facts surrounding this transaction, I must examine whether title to the goods remained with Mr. Taylor, whether Mr. Taylor reserved the right to take back the jewelry and whether Mr. Taylor regulated the price and terms of defendants' sale of the jewelry. *Tax Review,* 178 A.2d at 612; *Wells,* 140 F. at 753.

10. The Taylors needed and wanted to get out of their jewelry business because of health problems, therefore, they contacted defendants because of their long business relationship and their expertise in the area of liquidating merchandise. The defendants ultimately paid plaintiffs $900,000. Following their transaction, the parties continued to do some business with each. Mr. Taylor did not require the defendants to identify his goods as belonging to him. Mr. Taylor did not prevent defendants from commingling his jewelry with their own. Mr. Taylor did not require defendants to provide him with an inventory listing at the time they paid him each of the three checks totalling $900,000. Mr. Taylor did not require defendants to seek his approval before selling his merchandise. The parties did not establish any terms of any commission or fee Mr. Wachtler was to receive as the seller of the Taylor inventory. To date, Mr. Taylor has not paid nor made any arrangements to calculate or pay Mr. Wachtler any fee or commission. Mr. Taylor did not require defendants to bill customers on Taylor invoices or to set up a separate bank account for the proceeds of his jewelry sales. (N.T. Taylor at 92–95.)

11. In light of the parties' conduct and the lack of evidence that they intended this transaction to be a consignment, I find that Mr. Taylor's testimony that the agreement at issue was a consignment is not consistent with the evidence presented by the parties as to their conduct and intent.

12. I find that, and as testified to by the parties, in the jewelry business, the usual course of a transaction involves several steps. After a potential purchaser selects a piece(s) of jewelry, the seller issues a memorandum which may be referred to as a consignment memorandum. This memorandum documents the terms of the transaction including a description of the jewelry, the quantity and price of the transaction. The potential purchaser then takes possession of the jewelry even though he or she has not yet paid for it. If the potential purchaser decides to keep the jewelry, the seller issues an invoice and the purchaser remits to the seller the price of the jewelry. Once the invoice issues and payment is made then any consignment arrangement that may have existed between the buyer and seller no longer exists. In this case, if any consignment agreement had existed between the parties, it ceased to exist when defendants paid for the Taylor merchandise.[4]

13. The Taylors seek an accounting in equity, however, according to Pennsylvania law an accounting is not proper "where there is no fiduciary relationship between the parties, no fraud or misrepresentation is alleged, where the accounts are not mutual or complicated or where the plaintiff possesses an adequate remedy at law." *Buczek v. First Nat. Bank of Mifflintown,* 366 Pa.Super. 551, 531 A.2d 1122, 1124 (Pa.Super.1987).

14. Because the parties' agreement is not a consignment they are not in a fiduciary relationship, thus, the plaintiffs are not entitled to an accounting.

15. Even though I find that the signature on the June 13, 1989 document is a forgery of Mr. Taylor's signature, this is not material or relevant because the agreement is not a consignment. Moreover, as the fact-finder in this matter, it is my prerogative to believe part of a witnesses' testimony and discredit other portions of that same witnesses' testimony. *Miller v. C.P. Centers, Inc.,* 334

---

4. It should be noted that the same arrangement existed between the two parties when Mr. Taylor purchased a pin for his wife from Mr. Wachtler on October 16, 1989. Initially, Mr. Taylor took the pin pursuant to a consignment memorandum. Several weeks later he paid for the pin and Mr. Wachtler issued an invoice. At that time, any consignment agreement between the parties became a sale.

Pa.Super. 623, 483 A.2d 912, 915 (Pa.Super.1984).

### IV. *Conclusion*

While I am sympathetic to the plaintiffs' claims in this case, the testimony and other evidence presented during the trial does not indicate, much less prove, that the parties intended to enter into a consignment agreement.

While I agree with plaintiffs and believe that Mr. Taylor's signature was forged on the June 13, 1989 document and while I do not condone the defendants' failure to retain and return the plaintiffs' inventory records, my finding that their agreement was not a consignment renders these issues immaterial to the case.