In re DE–PEN LINE, INC., Debtor.

CF MOTOR FREIGHT, Plaintiff,

v.

Andrew N. SCHWARTZ

and

Delta Investments, Ltd., Defendants.

Bankruptcy No. 96–10569.
Adversary No. 97–1023DAS.

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Dec. 12, 1997.

Mark Blank, Jr., Paoli, PA, for Debtor.

Andrew N. Schwartz, Philadelphia, PA, Trustee.

Camille Spinale, Philadelphia, PA, for Trustee.

Robert C. Farley, Jr., Morgan, Lewis & Bockius, L.L.P., Philadelphia, PA, for CF Motor Freight.

Robert E. Giering, Reading, PA, for Delta Investments, Ltd.

Frederic Baker, Philadelphia, PA, Asst. U.S. Trustee.

## OPINION

David A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Two questions are presented by the above-captioned adversary proceeding ("the Proceeding"): (1) Who is entitled to the $27,-517.00 ("the Funds") owed to DE–PEN LINE, INC. ("the Debtor") by Plaintiff CF MOTOR FREIGHT ("CF"), Defendant ANDREW N. SCHWARTZ, Chapter 7 Debtor's trustee ("the Trustee"), or Defendant DELTA INVESTMENTS, LTD. ("DIL"), the self-described "factor" of the Debtor's accounts; and (2) Is CF, as the interpleader plaintiff in the Proceeding, entitled to attorney's fees and costs out of the fund and, if so, how much? We conclude that the Trustee is, for the most part, entitled to the Funds, with CF being entitled to modest attorneys' fees and costs, fixed by us at $1,150, out of that amount.

### B. PROCEDURAL AND FACTUAL HISTORY

The underlying Chapter 7 bankruptcy case was filed on January 24, 1996. The Trustee reported, at the November 18, 1997, trial of the Proceeding, that the Funds were the only asset of the Debtor's estate. Considering this fact, administration of this case has been painfully slow. On September 23, 1996, we directed the Trustee to file the final audit papers in this case by April 1, 1997. Given the limited assets of the estate, this schedule itself could be criticized as overly liberal. Nevertheless, not realizing the modesty of the estate, we granted the Trustee an extension until October 31, 1997. As it developed, the extended deadline was also not met and a further extension was requested by the Trustee in light of the pendency of the Proceeding.

The Complaint in the Proceeding avers that the Trustee demanded the Funds from CF as early as May 28, 1997, and that they were paid over to him on July 23, 1997. It seems to us that the Trustee could have easily met the October 31, 1997, deadline, even assuming *arguendo* that it was necessary for him to file an action in this court to establish his rights to the Funds vis-a-vis DIL, had he had a mind to do so.

In fact, the Trustee's failure to either administer the Funds quickly and put them out of the reach of DIL or file any action believed necessary to resolve his rights to the Funds prompted the Proceeding and cost the estate the fees payable to CF, although we will allow CF considerably less than it requested on this score.

As it developed, DIL filed a state court action ("the State Action") against CF seeking to recover the Funds on March 14, 1997. This action was suspended during negotiations among all three parties which came to naught. When DIL indicated an intent to proceed with the State Action after months of non-resolution, CF filed the instant proceeding on September 26, 1997, contending that they were interpleading the Funds and seeking to enjoin DIL from prosecuting the State Action against it.

At the trial of the Proceeding on its first scheduled trial date of November 18, 1997, only brief testimony of the Trustee was adduced. DIL's counsel explained that his client's principal was rather unexpectedly not present. However, we note that no continuance was sought. The Trustee testified that he had no evidence that DIL advanced funds to the Debtor other than the exhibits attached to DIL's Answer, which include copies of a check in the amount of $13,400.31 payable to the Debtor from DIL. The Trustee

also noted that DIL had not filed a proof of claim in this case at any time, the bar date of December 31, 1996, having long passed.

The documents of record also establish certain underlying facts. On or about July 21, 1995, DIL entered into a Factoring Agreement ("the Agreement") with the Debtor. Accordingly, the invoices are stamped with a statement that they have been "sold and assigned" to DIL and that DIL only is to be paid on account. However, the Agreement also provides that

> [i]f after a period of 60 days from date of invoices, payment has not been received, DIL will charge back to DE–PEN the monies advanced on that invoice plus the full factor fee, to be deducted from the following week [sic] advance payment.

The Agreement further states that DIL will pay to the Debtor eighty-six (86%) percent of the face amount of each invoice transferred to it immediately and will retain a four (4%) percent factoring fee. The remaining ten (10%) percent was apparently to be paid to the Debtor only upon collection of the amount payable.

From November 1995 to January 1996, the Debtor performed certain services for CF for which CF was obliged to pay it $27,517.00. Payment of that amount was outstanding as of January 24, 1996, the date on which the Debtor filed for bankruptcy. The Trustee testified that no other similar disputes have arisen and, as noted *supra*, that the Funds constitute the entire proceeds of the Debtor's estate.

At the close of the hearing CF asserted its claim to "reasonable attorney's fees" and costs of several thousand dollars. The Trustee disputed any such claim, contending that the Proceeding was not a "true" interpleader action because the Funds in dispute had already been paid over to him rather than having been deposited into court.

We ultimately directed CF to quantify and support its claim for attorney's fees and costs, by November 24, 1997; DIL to file a brief in support of its claims by December 3, 1997; and the Trustee to respond to all of the foregoing by December 11, 1997. CF submitted a detailed application for compen-

sation, requesting compensation for 54.3 hours of services at $100/hour, or $5,430, and costs of $301.68. The bulk of this time was spent in legal research on the law of interpleader, drafting the Complaint, preparing a pre-trial memorandum of law, and preparing for and attending the trial.

It its post-trial submission, DIL argued that, under the terms of the Agreement, it advanced funds to the Debtor in consideration for the Debtor's complete assignment of its rights to collect the CF account. Despite the nomenclature of the Agreement, it did not vigorously contend that it is actually a "factor" under the terms of the Agreement.

## C. DISCUSSION

### 1. The Trustee Is Entitled to Retain the Funds.

We begin by attempting to define DIL's rights as a "factor."

> Under the traditional concept of the term, a "factor" is one who is specially employed to receive goods from a principal and to sell them on behalf of the principal for compensation in the form of a commission.

42 AM.JUR.2d 5 (1995), citing, *e.g., Taylor v. Wachtler*, 825 F.Supp. 95, 103 (E.D.Pa.1993), referencing Pennsylvania law.

> However, that text goes on to explain that [w]hile in the past the terms "factor" and "commission merchant" were used interchangeably, "factoring" in modern commercial practice is understood to refer to the purchase of accounts receivable from a business by a "factor" who thereby assumes the risk of loss in return for some agreed discount. Indeed, the factor has emerged primarily as a financier, often a finance company or similar institution, which provides its clients (usually manufacturers or other suppliers of goods) with needed working capital and other financial assistance by purchasing their accounts receivable (footnotes omitted).

32 AM.JUR.2d, *supra*, at 6. Indeed, DIL was not a "commission merchant" for the Debtor, but instead purportedly purchased the Debtor's accounts receivable and thus served as its financier.

Speaking of "modern" factors, 4 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE 66 (4th ed.1995), states pertinently as follows:

> Article 9 applies to sales of accounts and chattel paper primarily because of their financing character. The reasons for this rule are most obvious with respect to certain sales of accounts and chattel paper done by "factors." "Factors" are lenders in sheep's clothing; routinely they "buy" accounts without recourse (footnote omitted).

Controlling authority in this jurisdiction, as White and Summers suggest, applies Article 9 of the Uniform Commercial Code ("the UCC") to such transactions. *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 542–46 (3d Cir.1979). *Accord, Octagon Gas Systems, Inc. v. Rimmer*, 995 F.2d 948, 954–58 (10th Cir.1993), *cert. denied*, 510 U.S. 993, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993); *In re Vigil Bros. Construction, Inc.*, 193 B.R. 513, 516–17 (9th Cir. BAP 1996); *In re Flowers*, 78 B.R. 774, 776 (Bankr.D.S.C. 1986); and *In re Cripps*, 31 B.R. 541, 542–44 (Bankr.W.D.Okla.1983).

In its post-trial submission, DIL attempts to distinguish *Vigil* because that case involved an assignment of an account in consideration for an obligation of the general contractor-debtor to a subcontractor-assignee. 193 B.R. at 515. *Cripps* is "distinguished" on the ground that the court there held that "title doesn't matter," while, here, "the parties intended the assignment as an absolute sale and not a security interest." Memorandum: Re Claim of Delta Investments Ltd., at 4. No effort is made to distinguish *Major's Furniture*, although, at the close of the trial, we cited this case to the parties as an apparently controlling authority.

■ With respect to the argument that the transaction at issue involved an "assignment," we note that an "assignment" is an "absolute and complete" transfer of property from one party to another. *See, e.g., In re Lease–A–Fleet, Inc.*, 141 B.R. 853, 861–62 (Bankr.E.D.Pa.1992). We also note that it has been held in Pennsylvania, as it has elsewhere, that "[c]ourts will not be controlled by the nomenclature the parties apply to their relationship." *Kelter v. American Bankers' Finance Co.*, 306 Pa. 483, 492, 160 A. 127, 130 (1932). In *Smith–Faris Co. v. Jameson Memorial Hospital Ass'n*, 313 Pa. 254, 260, 169 A. 233, 235 (1933), for example, it was said that

> "[n]either the form of a contract nor the name given it by the parties controls its interpretation. In determining the real character of a contract courts will always look to its purpose, rather than to the name given it by the parties. *** The proper construction of a contract is not dependent upon any name given it by the parties, or upon any one provision, but upon the entire body of the contract and its legal effect as a whole." 6 [W. McKINNEY & B. RICH, RULING CASE LAW] p. 836, § 226. [(1915)]

*Accord, Capozzoli v. Stone & Webster Engineering Corp.*, 352 Pa. 183, 186–87, 42 A.2d 524, 525 (1945). *See also In re Joseph Kanner Hat Co.*, 482 F.2d 937, 940 (2d Cir.1973) ("courts will determine the true nature of a security transaction, and will not be prevented from exercising their function of judicial review by the form of words the parties may have chosen").

In *Kanner, supra*, 482 F.2d at 938, the debtor obtained a loan of $25,000 from a bank and executed an assignment to the bank of $25,000 which was due to the debtor from a third party. The bank contended that the assignment constituted a transfer of an absolute right to collect whatever monies were due to the debtor from the third party. *Id.* The debtor's trustee in bankruptcy, however, argued that the transaction created no more than a security interest under the UCC, that the security interest had not been perfected by filing, and that the trustee's interest was entitled to priority over the bank's. *Id.* The court, looking to the true nature of the transaction, did not consider itself restricted by the form of words used by the parties. *Id.* at 940. Noting that the bank regarded and treated the assignment as a method of payment of a loan, the court held that, despite the "absolute assignment" of the entire claim, the transaction was no more than an assignment for security. *Id.*

In *Major's Furniture, supra*, 602 F.2d at 545, the court commented on the relevance of a leader's recourse against its debtor to the risks allocated in the agreement in question. It noted that the district court had properly found there was

> "an obligation to repurchase any account after the customer was in default for more than 60 days. Castle only assumed the risk that the assignor itself would be unable to fulfill its obligations. Guaranties of quality alone, or even guarantees of collectibility alone, might be consistent with a true sale, but Castle attempted to shift all risks to Major's, and incur none of the risks or obligations of ownership."

The court thus concluded that none of the risks present in a true sale were present in the transaction before it.

As in *Major's Furniture*, in the case at bar, a 60–day chargeback provision was present in the Agreement between DIL and the Debtor. It indicates, as is quoted in full at page 949 *supra*, "after a period of 60 days from date of invoices, payment has not been received, DIL will charge back to DE–PEN the monies advanced on that invoice." Upon carefully reviewing the Agreement and, in particular, the chargeback provision just quoted, we find that the risks which are characteristic of a true sale are not accepted by DIL in the Agreement. In light of the above, we find that the Agreement between DIL and the Debtor merely creates a security interest in favor of DIL. It is neither a traditional "factoring agreement," nor, since the transfer is not absolute, does it constitute an assignment.

Because Article 9 applies to assignments of accounts, the perfection requirements of Article 9 govern these transactions. *See* J. WHITE & R. SUMMERS, *supra*, at 64–66. In accordance therewith, the purportedly secured party must have filed a financing statement to have perfected its security interest. *Vigil, supra*, 193 B.R. at 517; and *Cripps, supra*, 31 B.R. at 543–44, are thus indistinguishable from the instant case on this point.

In the case at bar, DIL has admittedly failed to file a financing statement to protect any security interest which it might be found to have in the Debtor's accounts. DIL's failure to file a financing statement makes its interest that of an unsecured creditor which has not filed a proof of claim. In light of this conclusion, we hold that the Trustee is entitled to recover the Funds.

### 2. *CF Is Entitled to Only Modest Attorney's Fees and Costs of $1,150.*

Having determined the first and more important issue as to which party, between DIL and the Trustee, is entitled to the bulk of the Funds, we now turn to the second issue, CF's request for attorney's fees and costs arising out of the Proceeding in the total amount of $5,731.68.

In order to prevent the possibility of DIL's further prosecuting its claim in the State Action against CF and possibly subjecting CF to multiple liability, we agree with CF that an injunction is appropriate. "An injunction against overlapping lawsuits obviously is desirable to insure the effectiveness of the interpleader remedy. It prevents multiplicity of actions and reduces the possibility of inconsistent determinations or the inequitable distribution of funds." 7 Charles Alan WRIGHT, Arthur R. MILLER, Mary Kay KANE, FEDERAL PRACTICE AND PROCEDURE 612 (2d ed.1986). *See also First Interstate Bank of Oregon, N.A. v. United States*, 891 F.Supp. 543, 548 (D.Or. 1995) (injunctive relief against prosecuting or commencing other actions is "generally contemplated in interpleader actions"); and *Jefferson Standard Life Ins. Co. v. Smith*, 161 F.Supp. 679, 681 (D.S.C.1956) (granting permanent injunction). We conclude that an injunction against further prosecution of DIL's State Action is necessary to effectuate our judgment that the bankruptcy estate is the proper owner of the Funds. We note that the above cases conclude that an injunction is an appropriate remedy for the plaintiff in an interpleader action.

We agree with CF that, although it paid the Funds to the Trustee, the potential which it faced for multiple liability was real and constituted a basis for interpleader, despite the Trustee's assertions to the contrary.

Since neither the Trustee, who had clear access to this court to do so, nor DIL proceeded to file an action to resolve their competing claims, CF was, unfortunately, obliged to do so.

We do note, as is observed in 4 J. MOORE FEDERAL PRACTICE, ¶ 22 .06, at 22–99 (3d ed.1997), that "[t]here is no provision in either the Federal Interpleader Act or Rule 22 concerning the award of attorney's fees or costs to the stakeholder in an interpleader proceeding." However, that text, *id.*, at 22–99 to 22–100, goes on to state that

> [d]espite this sparse express authorization, modern federal practice follows the traditional equity rule that gives the trial court discretion to allow a disinterested stake holder to recover attorney's fees and costs from the stake itself.... Courts usually make such an award to a disinterested stakeholder who concedes liability in full, deposits the disputed funds with the court, and seeks discharge from the litigation ... (footnotes omitted).

We agree with CF that it is a "disinterested stakeholder" which asserts no interest to the Funds except its attorney's fees and costs. Although the Funds were paid to the Trustee rather than into court, a variation with which the Trustee could scarcely be expected to quarrel, the Trustee appears to concede that the dispute with DIL must be resolved before he could make distribution. We therefore conclude that CF, as an interpleader plaintiff, is entitled to certain attorney's fees and costs out of the Fund themselves.

However, we do not agree that it would be a proper exercise of our discretion to conclude that CF is entitled to an award of any amount close to $5,731.68. As we stated in *In re Temp–Way Corp.*, 80 B.R. 699, 705–06 (Bankr.E.D.Pa.1987), in reducing a stakeholder's request for $2,645 to $460.00,

> such an award is likely to be nominal, [3A J. MOORE, FEDERAL PRACTICE, ¶ 22.16[2],] at 22–174 [(2d ed. 1987)] ... because "the only services for which compensation is normally sought are those connected with the preparation and filing of a single pleading [for interpleader]." *Id.* at 22–173. As was aptly stated by the

Court in *Hunter v. Federal Life Insurance Co.*, 111 F.2d 551, 557 (8th Cir.1940):

> "Under ordinary circumstances there would be no justification for seriously depleting the fund deposited in court by a stakeholder through the allowance of large fees to his counsel. The institution of a suit in interpleader, including the depositing of the fund in the registry of the court and procuring of an order of discharge of the stake holder from further liability, does not usually involve any great amount of skill, labor or responsibility, and, while a completely disinterested stakeholder should not ordinarily be out of pocket for the necessary expenses and attorney's fees incurred by him, the amount allowed for such fees should be modest." ...

*Accord, e.g., In re OEM Industrial Corp.*, 135 B.R. 247 (Bankr.W.D.Pa.1991) (interpleader's demand for $12,938.62 in fees and costs is reduced to $1,000 fees plus $120 costs).

CF is represented by a large firm, Morgan, Lewis & Bockius, L.L.P. The particular attorney assigned, Robert C. Farley, Jr., is a young associate, as indicated by his low billable rate of $100/hour. Because the Proceeding perhaps represented Farley's first extensive encounter with interpleader, he proceeded to undertake considerable research, took many hours preparing a complaint, and spent additional time preparing memoranda and for trial, which, as it developed, featured only the Trustee and lasted less than half an hour.

While we do not doubt that Farley expended the time and energy documented, it would be unjust to exercise our discretion in such a manner as to deplete the Funds as a means of furthering Farley's learning experiences. We submit that experienced counsel would have ascertained that CF's award of fees and costs would be nominal and would have done nothing but expend an hour or two preparing the complaint and then let the Trustee and DIL tend to the trial and briefing. Following the lead of *OEM, supra*, we will therefore limit the award of attorney's fees and

costs payable to CF from the Funds to $1,000 plus the present filing fee of $150.

### D. CONCLUSION

An order consistent with this disposition, plus our granting the Trustee's motion to extend the deadlines for filing the Final Audit papers, will be entered.

### ORDER

AND NOW, this 15th day of December, 1997, upon discovering a transcription error in paragraphs 1 and 2 of our Order of December 12, 1997 ("the Order"), resolving the above-captioned proceeding ("the Proceeding") and the motion ("the Motion") of the Trustee to extend the time to file his Final Audit papers, it is hereby ORDERED AND DECREED as follows:

The funds of $27,517.54 at issue ("the Funds") are AWARDED to ANDREW N. SCHWARTZ ("the Trustee"), subject to the surcharge in favor of CF MOTOR FREIGHT ("CF") set forth in paragraph 4 of this Order.

3. DELTA INVESTMENTS, LTD. is ENJOINED from attempting to collect the Funds from CF in any lawsuit in any court.

4. CF is AWARDED attorney's fees of $1,000 and costs of $150 to be paid from the Funds.

5. The Motion is GRANTED.

6. The Trustee or his counsel shall file all papers, including any remaining Fee Applications, necessary to conduct a Final Audit hearing, *and serve a Certification of such filing upon the court in chambers,* on or before January 30, 1998.

7. If the Applications and timesheets of the Trustee and the Trustee's professionals are not filed and served by January 30, 1998, the Trustee's commissions may be limited to $500 and all compensation of the Trustee's professionals may be barred.

8. The Final Audit hearing in this case shall be conducted on

TUESDAY, MAY 19, 1998, AT 9:30 A.M.

and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.

9. The Trustee or counsel for the Trustee shall submit an Order of Distribution with the Audit papers, and shall thereafter file, *and serve a Certification of such filing upon the court in chambers,* the cancelled checks and zero bank statement; or an order, pertaining to disbursements made pursuant to the Order of Distribution, setting forth that there is a zero balance in the account and that the cancelled checks are no longer available on or before October 1, 1998.