In re VIGIL BROS. CONSTRUCTION, INC., Debtor.

CONCRETE EQUIPMENT CO., INC., Appellant,

v.

James D. FOX; Vigil Bros. Construction, Inc., Appellees.

BAP No. AZ–94–2562–JHAs.

Bankruptcy No. 90–11948–PHX–SSC.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Feb. 23, 1996.

Decided March 15, 1996.

Paul S. Harter, Phoenix, AZ, for Appellant.

David A. Damore, Scottsdale, AZ, for James D. Fox.

Charles L. Firestein, Phoenix, AZ, for Vigil Bros.

Before: JONES, HAGAN, and ASHLAND, Bankruptcy Judges.

## OPINION

JONES, Bankruptcy Judge:

## I. FACTS

Joe E. Woods, Inc., ("Woods") a general contractor, entered into a construction contract with Arizona State University. In order to fulfill the terms of the contract, Woods subcontracted with Vigil Bros. Construction, Inc. ("Vigil"). Vigil in turn subcontracted with Concrete Equipment Co., Inc. ("CECO") whereby CECO was obligated to provide equipment and labor necessary for pumping concrete. CECO fulfilled its obligations under the contract and billed Vigil. On June 25, 1989, Vigil executed a promissory note to CECO for $49,385.56 with interest accruing at a specified prime rate plus three percent (3%) per annum. On that same day, Vigil executed an assignment to CECO of the Woods' accounts receivable not to exceed $49,385.56. CECO did not file a financing statement.

On November 13, 1990, an involuntary chapter 7 petition[1] was filed against Vigil and an Order of Relief was entered on February 11, 1991. CECO filed a proof of claim in the amount of $49,385.56. The trustee objected to the claim on the grounds that CECO failed to produce evidence of a security agreement and failed to perfect its security interest. CECO responded by claiming that the assignment was an absolute assignment or in the alternative a valid security interest. Before trial, the trustee collected $35,000 on the Woods account in a full settlement between Vigil and Woods. The bankruptcy court approved this settlement by order dated September 8, 1992.

The bankruptcy court conducted an initial hearing on the trustee's objection to CECO's proof of claim on April 4, 1994, after which the court entered a pre-trial order on July 15, 1994. In the pretrial order, the court made findings of fact and conclusions of law that: the assignment was not an outright assignment, but rather a security interest governed by Article 9 of the Uniform Commercial Code ("U.C.C.") as adopted by the State of Arizona; CECO did not perfect its interest in the Woods account receivable by filing a financing statement; and perfection of a security interest required the filing of a financing statement except for an assignment of accounts which does not transfer a significant portion of the outstanding accounts of the assignor.

Trial was held on August 2, 1994 on the issue of whether Vigil assigned only an insignificant portion of its accounts, thereby excusing CECO from the requirement to file a financial statement. When asked the intention of the assignment, Steve Vigil, the President of Vigil at the time of the assignment, testified that Vigil "planned on continuing work" and that at the time Vigil did not have any money to pay CECO. Steve Vigil also testified as to the amount of accounts receivable at the time of the assignment. In a published memorandum decision[2] dated December 9, 1994 (amended April 19, 1995), the bankruptcy court found that Vigil had approximately $125,000 in accounts receivable and assigned $49,385.56 to CECO. In its decision, the court found that Vigil assigned a significant amount (40%) of its accounts to CECO and thus CECO was required to file a financing statement. CECO appeals this decision.

## II. ISSUES

1. Did the bankruptcy court err by holding that Article 9 of the Uniform Commercial Code as adopted by the state of Arizona governs the assignment of an account receivable?

2. Did the bankruptcy court err by holding that the assignment assigned a significant part of Woods' outstanding accounts and

1. Unless otherwise indicated, all references to Chapters, Sections and Rules are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, and to the Federal Rules of Bankruptcy Procedure, Rules 1001, *et seq.*

2. The bankruptcy court decision is reported at *In re Vigil Bros. Constr., Inc.,* 181 B.R. 453 (Bankr. D.Ariz.1995).

thus required a filed financing statement for perfection?

## III. STANDARD OF REVIEW

 Factual findings of the bankruptcy court are reviewed under the clearly erroneous standard. *In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989). Clear error exists when, after examining the evidence, the reviewing court is left with a definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948). The determination as to whether Article 9 governs the assignment of accounts receivable and whether an exception to the filing requirement is met are legal conclusions interpreting statutory construction which is reviewed de novo. *See In re Mayer*, 167 B.R. 186, 188 (9th Cir. BAP1994).

## IV. DISCUSSION

A. *The Assignment of the Woods Account was not an Absolute Conveyance, but Instead Created a Security Interest in CECO.*

CECO claims that the assignment of the Woods account acted as an absolute conveyance which divested Vigil of all right to the account and immediately vested CECO with all rights, title and interest to the account. CECO claims that because Vigil no longer owned the account, the account was not an asset of the bankruptcy estate and the bankruptcy court lacked jurisdiction to enter orders regarding the account. We hold that the assignment was not an absolute conveyance, but instead created a security interest in CECO. Thus, the account remained as property of the estate and the bankruptcy court had jurisdiction to enter orders regarding the account.

1. *An assignment of accounts is governed by the Uniform Commercial Code as adopted by the State of Arizona.*

 Prior to Arizona's adoption of the U.C.C., an assignment of account divested the assignor of all interest in the account and created a vested interest in the assignee of all right, title and interest in the account. *See Valley Nat'l Bank of Arizona v. Byrne*, 101 Ariz. 363, 419 P.2d 720, 722 (1966). Pre-U.C.C., Arizona enacted the Assignment of Accounts Receivable Act, which would allow an assignee to obtain priority over present and future creditors if the assignee filed a notice of assignment. Ariz.Rev.Stat.Ann. ("A.R.S.") § 44–801 et seq. (repealed 1967). Arizona adopted the Uniform Commercial Code in 1967, effective January 1, 1968,[3] which acted to repeal the assignment of accounts statute. *Black, Robertshaw, Frederick, Copple & Wright, P.C. v. United States*, 130 Ariz. 110, 634 P.2d 398, 400 (Ct.App. 1981). Assignment of accounts, with certain exceptions, is now governed by Article 9 of the U.C.C. A.R.S. § 47–9102 (1988).

 CECO claims that the assignment did not create a security interest, but rather was an outright assignment of the Woods account. CECO cites to Arizona case law in which assignments were treated as outright assignments. The case law cited by CECO however, is not controlling. The Arizona case law cited by CECO either dealt with assignment of choses of action, which are not the same as assignment of accounts and are not governed by the U.C.C., *see Martinez v. Bucyrus–Erie Co.*, 113 Ariz. 119, 547 P.2d 473 (1976); *State Farm Mutual Ins. Co. v. St. Joseph's Hospital*, 107 Ariz. 498, 489 P.2d 837 (1971), or assignment of account case law dated before Arizona's adoption of the U.C.C. in 1968. *See Valley Nat'l Bank of Arizona v. Byrne*, 101 Ariz. 363, 419 P.2d 720 (1966); *Millsap v. Sparks*, 21 Ariz. 317, 188 P. 135 (1920). The only Arizona case law on point is *Black, Robertshaw, Frederick, Copple & Wright, P.C. v. United States*, 130 Ariz. 110, 634 P.2d 398, 400 (Ct.App.1981), in which the court held that all assignments of accounts, with certain exceptions listed in what is now A.R.S. § 47–9104, are now governed by Article 9.

---

**3.** In 1975, Arizona substantially adopted the 1972 revised version of the U.C.C.1975 Ariz.Sess. Laws, Ch. 65. All relevant sections of the U.C.C. for purposes of this appeal remained unchanged in the 1972 version. Additionally, the official comment to the 1972 official text also remained the same as the 1962 official comment for sections relevant to this appeal.

2. *All assignments of accounts are governed by the U.C.C., even if the transaction was not intended to have effect as security.* ·

■ CECO claims that the assignment did not create a security interest because the parties did not intend for it to have such effect. Section 47–9102 of the U.C.C. as adopted by Arizona provides:

Except as otherwise provided in § 47–9104 on excluded transactions, this chapter applies:

1. To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts; and also

2. To any sale of accounts or chattel paper.

A.R.S. § 47–9102 (1988). This section is identical to § 9–102 of the official U.C.C. Thus, we can look to the official comments to the official text of the U.C.C. for guidance. The official comments to the 1962 and 1972 official text state "[e]xcept for sales of accounts, contract rights and chattel paper, the principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security." The official comment goes on to say that because "commercial financing on the basis of accounts ... is often so conducted that the distinction between a security transfer and a sale is blurred, sale of such property is therefore covered by subsection (1)(b) whether intended for security or not...." The official comment states that "[t]he buyer then is treated as a secured party, and his interest as a security interest."

■ CECO argues that it was the mutual intent of the parties to have the assignment act as an absolute conveyance rather than a security interest. CECO's argument is in error. Any assignment of an account falls under the purview of Article 9 of the U.C.C.

■ The clear rule in Arizona is that an assignment of accounts is governed by Article 9. *Black, Robertshaw, Frederick, Copple & Wright, P.C. v. United States,* 130 Ariz. 110, 634 P.2d 398, 400 (Ct.App.1981). The concept that Article 9 provisions apply to any assignment of accounts has also been developed in case law in states whose commercial codes substantially parallel provisions of U.C.C. Article 9. *See Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc.,* 602 F.2d 538 (3d Cir.1979) (stating that Article 9 governs all transactions in accounts, including both sales of accounts and secured interests in accounts, thus even an outright buyer of accounts by definition has a security interest in the accounts which it purchases); *Valley Bank of Nevada v. City of Henderson,* 528 F.Supp. 907 (D.C.Nev.1981) (noting that any transaction intended to create a security interest in accounts and any sale of accounts falls within the scope of Article 9); and *In re Cripps,* 31 B.R. 541 (Bankr.W.D.Okla.1983) (holding that where an outright buyer of accounts receivable failed to perfect her interest in debtor's account by filing a financing statement, the buyer could not prevail over the bankruptcy trustee, as lien creditor).

The official comments to the U.C.C., persuasive case law from Arizona and other jurisdictions, and the fact that an assignment of accounts is listed in subsection (1)(b) rather than subsection (1)(a) which speaks to intent, clarify that intention of the parties is irrelevant. Therefore, the bankruptcy court was correct in finding that the assignment of the Woods account created a security interest in CECO, the assignee.

*B. CECO was Required to Perfect Its Security Interest.*

■ Because Article 9 applies to assignments of accounts, the perfection requirements of Article 9 govern these transactions. James J. White & Robert S. Summers, *Uniform Commercial Code* § 30–9 (4th ed. 1995). The assignee must file a financing statement to perfect its security interest. A.R.S. § 47–9302 (Supp. 1995). The official comments to the 1962 and 1972 official text of the U.C.C. state that Article 9 adopts the filing requirements "on the theory that there is no valid reason why public notice is less appropriate for assignments of account than for any other type of non-possessory interest." Many parties buy accounts outright without

recourse. Given these practices, if account buyers are to have priority against other creditors of the borrower who might assume that the borrower has not sold or encumbered his accounts, the account buyer must publicize his claim by filing a financing statement. White & Summers, *Uniform Commercial Code* § 30–9 (4th ed. 1995). Even though not all assignments are of a financing nature, the official comments state that Article 9 applies to all assignments to avoid "difficult problems of distinguishing between transactions intended for security and those not so intended."

▮ There is an exception, however, to the filing requirements for "[a]n assignment of accounts which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts of the assignor." A.R.S. § 47–9302(A)(5) (Supp.1995). Such assignments enjoy automatic perfection. White & Summers, *Uniform Commercial Code* § 31–10 (4th ed. 1995). The assignee has the burden of proving "insignificance." *Black, Robertshaw, Frederick, Copple & Wright, P.C. v. United States,* 130 Ariz. 110, 634 P.2d 398, 402 (Ct.App.1981).

Courts have recognized three tests in determining significance: (1) a percentage of accounts test; (2) a "casual and isolated transaction" test; and (3) a combination of (1) and (2). *Id.,* 634 P.2d at 400. The court in *Black* cited as persuasive authority White & Summers, *Uniform Commercial Code,* § 23–8 (1972), which favored the percentage test because it would produce a comparatively certain and reliable rule on which parties could rely.[4] The court in *Black,* however, did not select a specific test for Arizona because there was no evidence presented as to "significance." *Id.,* 634 P.2d at 402.

The bankruptcy court in this case decided to use the percentage of accounts test based upon the reasoning of White & Summers. CECO argues that the bankruptcy court erred by not using the casual and isolated test. CECO argues that if the creditor satis-

fies one test, the transaction must, as a matter of law be excluded. In order to determine whether the bankruptcy court erred in choosing the percentage of accounts test, it is necessary that we analyze case law on both tests and the interaction between the two tests.

### 1. *The percentage of accounts test*

Under the percentage of accounts test, a court asks only what percentage of the total accounts of the assignor were assigned and whether that percentage constitutes a "significant" part of the whole. White & Summers, *Uniform Commercial Code,* § 31–10 (4th ed. 1995). Courts have attempted to define what percentage constitutes a significant part of the assignor's account receivables. An assignment of an account which represented 16% of the assignor's accounts receivable has been held not to be a significant part and thus fell within the exception to filing. *Standard Lumber Co. v. Chamber Frames, Inc.,* 317 F.Supp. 837, 840 (E.D.Ark. 1970). However, an assignment representing 20% of the assignor's accounts receivable has been held to be significant, thus requiring a filed financing statement for perfection. *Miller v. Wells Fargo Bank Int'l Corp.,* 406 F.Supp. 452, 477 (S.D.N.Y.1975), *aff'd,* 540 F.2d 548 (2d Cir.1976). In *In re Klein Glass & Mirror, Inc.,* 155 B.R. 718, 721 (Bankr. S.D.Tex.1992), the court held that an assignment of 40% of the assignor's accounts was significant, requiring the filing of a financing statement.

In this case, the bankruptcy court made a factual finding that as of the time of the assignment of $49,385.56 to CECO, Vigil's had outstanding accounts of $125,000. Although there is some question as to the certainty of the $125,000 figure because of loss of Vigil's records, we do not find that the bankruptcy court's finding of outstanding accounts of $125,000 was clearly erroneous. The bankruptcy court then concluded that the assignment of 40% of Woods' accounts receivable to CECO was significant. In light of the above analyzed case law, we find that

---

4. White & Summers, *Uniform Commercial Code,* § 31–10 (4th ed. 1995), no longer favors either the percentage test or the "casual and isolated" test, but instead states "certainty in this setting is

no more than a will o' the wisp." However, this change initiated after the *Black* court's reliance on White & Summer's.

the court did not err by determining that 40% was a significant percentage. However, we still must determine whether the court erred by adopting the percentage test by analyzing the "casual and isolated" test.

### 2. The "casual and isolated" test

The "casual and isolated" test was extrapolated from the official comments to the 1962 and 1972 official text of the U.C.C. § 9–302 dealing with the "significant" exception, which states:

The purpose of the subsection (1)(e) exemption is to save from ex post facto invalidation casual or isolated assignments: some accounts receivable statutes were so broadly drafted that all assignments, whatever their character or purpose, fell within their filing provisions. Under such statutes many assignments which no one would think of filing might have been subject to invalidation.

"The totality of the circumstances surrounding the transaction determines whether an assignment was casual or isolated." *In re Tri–County Materials, Inc.,* 114 B.R. 160, 164 (C.D.Ill.1990). Under this test, a court may consider whether the assignee or assignor is in the business of commercial financing and whether the assignee regularly takes assignment of any debtor's accounts as part of its business. *See Klein,* 155 B.R. at 720. Even if the assignee is not in the business of accepting assignments, or had not done so in the past, an assignment still may fail the "casual and isolated" test if it is a "classic secured transaction." *Tri–County,* 114 B.R. at 165. *Tri–County* was a case involving facts similar to the facts in this case. Ladd Construction Company ("Ladd") was a general contractor who entered into a contract in which Tri–County would act as a subcontractor. Tri–County then entered into a contract with KMB to provide equipment to Tri–County. Tri–County then assigned part of its account with Ladd to KMB for purposes of securing rental charges which Tri–County owed to KMB. Although the assignment of the account only represented 12% of Tri–County's total accounts, the court found that despite the "isolated" nature of the transaction, it was a "classic secured transaction" thus failing to fall within the "casual and

isolated" exception. *Id.* at 165. The court reasoned that this was "not the type of 'casual' transaction in which reasonable parties would fail to see the importance of filing." *Id.* The court considered that the assignment was evidenced by a formal written agreement between two corporations, notice was sent to Ladd, the general contractor, and other conduct engaged in by KMB indicated the degree of formality attached to the assignment. *Id.* The court then stated "[t]his is the type of transaction for which the U.C.C. requires filing in order to perfect." *Id.*

The *Tri–County* decision is also important for its interaction between the percentage test and the "casual and isolated" test. The *Tri–County* court held that both the percentage test and the "casual and isolated" test must be met, reasoning that the statutory language specifically requires that the assignment be of an insignificant part, which must at the very least be met in every case. *Id.* at 164. Thus, "[a] showing of a casual or isolated assignment of a significant part of outstanding accounts would not be entitled to the exemption given this clear statutory requirement." *Id.* However, pursuant to the comments to the U.C.C., if a case involves an insignificant part but the assignee is one whose regular business is financing, the exception should not apply. *Id.* This logic was also used in *In re Klein Glass & Mirror, Inc.,* 155 B.R. 718, 722 (Bankr.S.D.Tex.1992), in which the court stated that in light of the plain language of the statute, the percentage of accounts assigned must be considered as part of the casual and isolated analysis. The court reasoned that "[i]f the legislature had intended that all 'casual and isolated' transactions regardless of the proportion of accounts assigned be exempt from the filing requirement, it could have, and no doubt would have, stated so in the statute." *Id.* The court further stated that any other interpretation would allow a debtor to assign 100% of its accounts in a casual and isolated transaction, without requiring the assignee to give notice to other creditors, which would be "totally inconsistent with the plain meaning of the language of the statute." *Id.*

We agree with the rationale of these two cases and find that the plain language of A.R.S. § 47–9302(A)(5) governs. The term "casual and isolated" was included in the official comment as an interpretation of the purpose of the statute. However, the plain language of the statute only exempts from the filing requirement an assignment of accounts which does not assign a significant part of the outstanding accounts of the assignor. Thus, an assignment of a significant part of outstanding accounts is not a casual and isolated transaction, and a financing statement must be filed to give notice to other creditors. We find that the bankruptcy court did not err by choosing the percentage of accounts test. We **HEREBY AFFIRM** the bankruptcy court's decision that the assignment of 40% of outstanding accounts was significant and that CECO was required to file a financing statement in order to perfect its security interest.

*C. The Assignment was not for Purposes of Collection Only.*

Finally we note that CECO has argued for the first time in its reply brief that the assignment was for purposes of collection only, and as such is excluded from Article 9 pursuant to A.R.S. § 47–9104(6). The rule is well established that an issue not raised by a party in the court below will not be considered on appeal, absent exceptional circumstances. *United States v. Oregon,* 769 F.2d 1410, 1414 (9th Cir.1985). CECO failed to raise the issue of this exclusion in the bankruptcy court, and has not proven any exceptional circumstances that would justify our consideration of this issue. However, even if we do consider this issue on appeal, we find that this was not an assignment for purpose of collection only and Article 9 applies. A.R.S. § 47–9104(6) provides that Article 9 does not apply to an assignment of accounts for the purpose of collection only. In *Bramble Transp., Inc. v. Sam Senter Sales, Inc.,* 294 A.2d 97, 101 (Del.Super.Ct.1971), *aff'd,* 294 A.2d 104 (Del.1972), a case involving an identical provision, the court held that the exclusion "is for the purpose of removing from the Code assignments of a non-commercial nature such as those to a collection agency for the sole purpose of

facilitating collection of a debt. It does not purport to exclude transactions generally considered financing in nature." It is clear that Vigil did not intend to have CECO facilitate collection of the Woods account on Vigil's behalf. Thus, CECO does not meet the exception and Article 9 applies.

### V. CONCLUSION

Article 9 governs all assignments of accounts receivable. The assignment of the Woods account by Vigil to CECO is thus subject to the perfection requirements of Article 9. The bankruptcy court did not err in finding that the assignment did not enjoy automatic perfection pursuant to A.R.S. § 47–9302 because it was an assignment of a significant portion of Vigil's outstanding accounts receivable. The bankruptcy court was correct in holding that CECO was required to file a financing statement in order to perfect its interest. CECO failed to file a financing statement and thus holds the position of an unsecured creditor. The bankruptcy court properly sustained the trustee's objection to CECO's proof of claim. For these reasons, we **HEREBY AFFIRM.**