In re ROPT LIMITED PARTNERSHIP.

Stuart A. ROFFMAN, Appellant,

v.

Joseph G. BUTLER, Trustee in
Bankruptcy, Appellee.

BAP No. MB96–068.

United States Bankruptcy Appellate Panel
of the First Circuit.

June 19, 1997.

Stephen F. Gordon and Gordon & Wise, Boston, MA, was on brief for appellant.

Joseph G. Butler with whom Barron & Stadfeld, P.C., Boston, MA, was on brief for appellee, Joseph G. Butler, Chapter 11 Trustee.

Daniel J. Carragher with whom Mark C. Rosenthal and Day, Berry & Howard, Boston, MA, were on brief for appellee, Sun Life Assurance Company of Canada (U.S.).

Before VOTOLATO, GOODMAN and HAINES, Bankruptcy Judges.

HAINES, Bankruptcy Judge.

On November 6, 1996, at the conclusion of hearings concerning chapter 11 debtor ROPT Limited Partnership's motion for authority to use cash collateral and Sun Life Assurance of Canada (U.S.)'s motion for appointment of a chapter 11 trustee, the bankruptcy court ordered Stuart A. Roffman, the debtor's principal, to return $84,500.00 to ROPT's estate. From that order Roffman appeals.

We conclude that the jurisdictional and procedural pillars on which the lower court's order rests are infirm and, therefore, vacate the order.

## *Background*

An understanding of the procedural context of the order on appeal is an essential prerequisite to our discussion. We therefore explicate it in detail.[1]

### *1. A Brief History.*

ROPT commenced its current voluntary chapter 11 case (the "1996 case") with substantial baggage in hand. It had been a voluntary chapter 11 debtor previously (the "1992 case")[2] and had confirmed a plan of reorganization (the "1993 plan") on April 8, 1993. (Appellees' Appendix at 56–63.) Following the 1993 plan's confirmation, a final decree issued and the case was dismissed. ROPT failed miserably in executing the 1993 Plan. As a result, it brushed with bankruptcy a second time in August 1996 when trade creditors and its former counsel filed an involuntary bankruptcy petition against it. (Appellees' Brief at 2; Appellees' Appendix at 103.)[3] The involuntary case was dis-

---

1. The bankruptcy court's order is unaccompanied by findings of fact. The process leading to the order's issuance is plain from the record. Other facts on which this appeal turns may be gleaned from the parties' briefs and are not in dispute.

 Throughout this memorandum, unless otherwise noted, citations to statutory sections are to the Bankruptcy Reform Act of 1978 ("Bankrupt-

cy Code" or "Code"), as amended, 11 U.S.C. § 101 *et seq.*

2. The 1992 case was designated Case No. 92–16023–CJK. (Appellees' Brief at 2.)

3. The involuntary case was designated Case No. 96–15114–WCH. (Appellees' Brief at 2 n. 1.)

missed on ROPT's motion on September 5, 1996. (Brief of Appellee at 2, n.l.) Within a month, on October 3, 1996, ROPT filed its second voluntary petition, commencing the 1996 case. (Appellant's Appendix at 1.)

In 1996, as had been the case in 1992, Sun Life was the debtor's principal adversary. (Appellees' Appendix at 56–63.) ROPT's debt to Sun Life was secured by ROPT's only substantial, tangible assets, adjacent office buildings in Brookline, Massachusetts. In 1996, as in 1992, Roffman was the prominent figure in ROPT's ownership and in its organizational and management structure, being the sole shareholder of ROPT's corporate general partner and a limited partner. (Brief of Appellant at 3–4; Brief of Appellee at 2–4.) In addition, Roffman either owned or controlled SAR Management Company, an entity employed by ROPT to manage its buildings. (Appellant's Brief at 3–4, 21–22; Appellees' Appendix at 79, 87.)

Under the 1993 Plan, Sun Life retained a lien on the debtor's office buildings to secure a claim for $3,965,000.00 and became entitled to plan dividends on a $336,673.00 unsecured claim. (Brief of Appellant at 4; Brief of Appellee at 2.) By September 1996, ROPT had defaulted on both plan obligations to Sun Life. Sun Life obtained a state court judgment against ROPT for its full unsecured dividend and commenced foreclosure on the properties securing the balance of its claim.

### 2. The 1996 Filing,

ROPT commenced the 1996 case just "hours" before the time set for Sun Life's foreclosure sale. (Appellees' Brief at 4.) Not surprisingly, Sun Life maintained a certain skepticism regarding ROPT's reorganization prospects in 1996. Within a few days of the petition, Sun Life moved to prohibit ROPT's use of cash collateral and to require a complete cash collateral accounting. *See* 11 U.S.C. § 363(a) (defining cash collateral); § 363(c)(2) (prohibiting use of cash collateral without secured creditor's consent or court authorization); Fed. R. Bankr.P. 4001(b), (d)

(procedures for obtaining cash collateral authority and approval of stipulations regarding cash collateral use). (Court Docket, Appellant's Appendix at 2.) The motion was set for hearing on October 18, 1996.

### 3. The October 18 Hearing.

During the course of the October 18 hearing ROPT moved for authority to use cash collateral on an interim basis. Sun Life objected, largely because ROPT had provided little information about where rents from its buildings (which rightly should have paid down Sun Life's secured claim) had gone. In response to inquiries from Sun Life and the court, ROPT's counsel represented that, after ROPT ceased paying Sun Life, it devoted available rent receipts to building improvements. (Transcript of 10/18/96 hearing ("10/18 Trans."), Appellees' Appendix at 90, 109.) The fact that SAR (or Roffman) had received $84,500.00 from ROPT while it was in default of its plan obligations did not come to light. (Appellees' Brief at 4.) [4]

Several factors in addition to ROPT's track record gave the bankruptcy judge pause on October 18. She noted that, although the 1996 case was over two weeks old, ROPT had yet to file an application to employ counsel, had not established the debtor-in-possession bank accounts required by the Code and Rules, and had not yet filed its schedules and statements. She suggested that it might be appropriate to appoint a trustee *sua sponte*. (10/18 Trans., Appellees' Appendix at 95–96, 101.) Sun Life expressed its intention to move for relief from the automatic stay or to seek dismissal on the ground that ROPT's filing was an impermissible attempt to modify the 1993 Plan. (10/18 Trans., Appellees' Appendix at 98, 101–02.) In response, ROPT represented that schedules, statements, and an application to employ counsel would be filed forthwith and promised to set up its debtor-in-possession bank accounts before the end of the day. (10/18 Trans., Appellees' Appendix at 112, 118–19.)

---

**4.** The exact time that ROPT's Statement of Affairs, which did reveal $84,500.00 in transfers to SAR, was filed is not apparent from the record. (Appellant's Appendix at 1–9; Appellant's Appen-

dix at 77–87.) Appellant does not dispute Appellee's representation that ROPT filed the statement on October 18, 1996, after the hearing concluded.

After reviewing the debtor's immediate cash needs, Sun Life agreed to allow interim use of cash collateral pending further hearings, which the court set for November 6, 1996. (10/18 Trans., Appellees' Appendix at 114–15.)

### 4. Post-Hearing Developments.

Notwithstanding the interim agreement, on October 28, 1996, Sun Life filed a motion seeking conversion to chapter 7, relief from the automatic stay, or dismissal of ROPT's bankruptcy case. (Court Docket, Appellant's Appendix at 4; Appellees' Appendix at 120.) In the meantime, ROPT filed a written motion for authority to use cash collateral. Sun Life opposed the ROPT motion. (Court Docket, Appellant's Appendix at 4.)

### 5. The November 6 Hearing.

When the November 6, 1996, hearing convened, the only issue before the court was ROPT's motion for authority to use cash collateral. (Transcript of 11/6/96 Hearing ("11/6 Trans."), Appellant's Appendix at 10.) The bankruptcy judge explained to ROPT's attorney what she saw as the critical issue:

> **The Court:** Okay. So, Mr. Milione, what I'd like you to do, if you would, is address the issues raised in your motion and in the objection by Sun Life, which as I see it basically says that your client's—actually your client's principal has mishandled money in the past and shouldn't be permitted to do so in the future.
>
> **Mr. Milione:** Your Honor, I'm just looking at this opposition today for the first time. I think I can address all of these issues.
>
> **The Court:** Well, do you want to take a recess to read it? Because it raises some very serious points here.
>
> **Mr. Milione:** Your Honor, if I might—
>
> **The Court:** Sure.
>
> **Mr. Milione:**—I think I'd like to.

**5.** After hearing the explanation and justification proffered by ROPT's attorney, the judge commented:

**The Court:** No problem. We'll reconvene in about ten minutes. Thank you.

(11/6 Trans., Appellant's Appendix at 11.)

When the hearing reconvened, ROPT's counsel addressed the debtor's 1996 payments to SAR. He pointed out that the transfers had been disclosed on ROPT's Statement of Financial Affairs; "explained" that, because Sun Life had declared ROPT's default, the money was transferred to another entity as a precaution against the possibility that Sun Life might seek to attach ROPT's bank accounts; and acknowledged that the transfers "were for [Roffman's] benefit." (11/6 Trans., Appellant's Appendix at 12–13.) Debtor's counsel also explained that, as the 1993 Plan provided, Roffman had contributed "over $100,000.00" to ROPT from 1993 to 1996; observed that, notwithstanding the 1993 Plan's general prohibition of payments to benefit Roffman until creditors were paid, ROPT permissibly could pay up to five percent of gross receipts in management fees (an expense category in which the payments were supposedly subsumed); and, finally, represented that Roffman was "prepared to pay those [funds] back to the estate." (11/6 Trans., Appellant's Appendix at 15–16.) He continued:

> **Mr. Milione:** [Roffman] also believed that the management fee was less than what he had contributed out of his own funds during the performance of the three years— during the plan performance for three years, and that's the reason that he took the money. I'm not saying that it's right, and with hindsight it was probably wrong, and the issue of how this impacts going forward really is an issue of how do we make Sun Life comfortable that he's not going to take money out of the VIP [sic] account.

(11/6 Trans., Appellant's Appendix at 16.)

ROPT's explanation and offer to restore the funds did not mollify the bankruptcy judge, who commented that Roffman would not win the ability to manage the debtor (and use Sun Life's cash collateral) by acts of contrition volunteered after "having his hand caught in the till." (11/6 Trans., Appellant's Appendix at 14, 16.)[5] Sun Life's counsel

**The Court:** ... I'm not comfortable with somebody who does something like this. So at this point, even given your explanation, I'm

then moved orally for appointment of a chapter 11 trustee, articulating additional reasons why a trustee should be appointed, including the fact that Roffman had been occupying office space in one of the debtor's properties "rent free" for three and a half years. (11/6 Trans., Appellant's Appendix at 19.) The court recessed the hearing once again so that Mr. Milione could discuss with Mr. Roffman the debtor's inclination to agree to installing a chapter 11 trustee.

The bankruptcy judge explained that, in light of the debtor's concession that it had transferred $84,500.00 ("probably wrongfully") for Roffman's benefit, there was no need for evidentiary hearings or further argument on the question whether a chapter 11 trustee should be appointed. Debtor's counsel did not protest, but asked that Roffman be provided an opportunity to be heard. As to the $84,500.00 transfer, Roffman explained:

> **Mr. Rothman [sic]:** Yes, Your Honor. I read the plan and I believed I was entitled to a five per cent management fee. I put in over $100,000.00 of my money into the property during the plan.

(11/6 Trans., Appellant's Appendix at 24–25.) He followed with a general plea to manage the debtor's properties without a trustee for a sufficient time to refinance them and offered to contribute additional personal funds, as necessary, if the court were to refuse the debtor authority to use cash collateral. (11/6 Trans., Appellant's Appendix at 24–26.) Immediately thereafter, the bankruptcy judge ruled:

> **The Court:** Okay. Thank you. I'm going to do this: I'm ordering Mr. Rothman [sic] to return that $84,500.00 by the close of business tomorrow. Let's make it four o'clock tomorrow. That money should have never left, and it certainly should have gone back a long time ago, so it must go back into the debtor-in-possession account, and you need to provide proof to the U.S. Trustee and to Sun Life that that money has gone back.

I'm going to allow Sun Life's oral motion to appoint a Chapter 11 Trustee this morning, and I'm basing the appointment of the Chapter 11 Trustee on the transfer—transfers of money made pre-petition, though there seem to be some other issues that are raised as well, but as I see it, transferring funds out of the debtor corporation [sic], funds which are clearly Sun Life's cash collateral, to corporations or entities owned or controlled by Mr. Rothman [sic], who is the principal of this debtor, that is clearly inappropriate, and it's not sufficient to say, "Well, I'll put the money back and everything's undone." That's just not going to work.

\* \* \*

(11/6 Trans., Appellant's Appendix at 26–27.) The court immediately entered its written order requiring Roffman to "return" the funds no later than 4:00 p.m. on November 7, 1996. (Appellant's Appendix at 29.) This appeal ensued.

### Discussion

#### 1. Appellate Jurisdiction.

The bankruptcy court's order of November 6, 1996, is a "final judgment, order [or] decree" over which the Bankruptcy Appellate Panel has jurisdiction under 28 U.S.C. § 158.

#### 2. Standard of Review.

In the absence of disputed factual findings, we review the bankruptcy court's legal ruling *de novo*. *See Concrete Equip. Co. v. Fox (In re Vigil Bros. Constr., Inc.)*, 193 B.R. 513, 516 (9th Cir.BAP 1996) (Bankruptcy Appellate Panel reviews trial court's legal conclusions *de novo*); *see also Auburn Police Union v. Carpenter*, 8 F.3d 886, 892 (1st Cir.1993); *Brewer v. Madigan*, 945 F.2d 449, 452 (1st Cir.1991).

#### 3. Framing the Issues.

Roffman contends that the bankruptcy court's order must be vacated because it was entered without initiation of an adversary

---

not going to permit the debtor to use cash collateral based on that factor alone. So that question—it seems to me any principal of a company who acts in derogation of his duties under a Chapter 11 plan is not someone to be trusted with cash collateral, so given that fact, where are we going here?

(11/6 Trans., Appellant's Appendix at 16.)

proceeding and because he was not provided adequate notice and an opportunity to be heard before it entered. Sun Life and ROPT's chapter 11 trustee defend the order as a proper, *sua sponte* exercise of the bankruptcy judge's § 105(a) powers.

Although the bankruptcy court's order refers to no Bankruptcy Code section pursuant to which it was entered, the appellees assert that it issued pursuant to § 105(a) and should be sustained under that section. Upon careful review of the hearing transcripts for October 18 and November 6, 1996, we discern no other lawful post to which the order could be tethered.

#### 4. Section 105(a).

 Section 105(a) empowers a bankruptcy judge to issue such "order, process or judgment" as may be "necessary or appropriate" to effect title 11's provisions.[6] It "grants broad powers to bankruptcy courts to implement the provisions of Title 11 and to prevent an abuse of the bankruptcy process." *In re Volpert,* 110 F.3d 494, 500 (7th Cir. 1997). The section provides bankruptcy courts the "power to take whatever action is appropriate or necessary" in aid of their jurisdiction. 2 Collier on Bankruptcy 105.01 at 105–5 (Lawrence P. King ed., 15th ed. Rev.1997) (hereafter "Colliers"). The court may act *sua sponte* even in instances where the language of other Code sections appears to limit the ability to initiate action to "parties in interest." *See In re Pedro Abich, Inc.,* 165 B.R. 5, 7–8 (D.P.R.1994) (section 105 authorized bankruptcy court's *sua sponte* consolidation of three chapter 11 cases and their subsequent conversion to chapter 7); (*In re Amezaga),* 192 B.R. 37, 40 (Bankr. D.P.R.1996) (stating that in exceptional circumstances § 105(a) would authorize a bankruptcy court to *sua sponte* move to enlarge

the time in which complaints objecting to discharge may be brought); *In re Petit,* 189 B.R. 227, 229 (Bankr.D.Me.1995) (chapter 13 case converted *sua sponte* to chapter 7); *cf. Donaldson v. Bernstein,* 104 F.3d 547, 552 (3d Cir.1997) (section 105 authorized bankruptcy court's *sua sponte* re-opening of closed case). *See generally Fukutomi v. United States Trustee (In re Bibo, Inc.),* 76 F.3d 256, 258 (9th Cir.) (notwithstanding § 1104(a)'s language limiting appointment of a trustee in a chapter 11 case ("on request of a party in interest or the United States trustee") bankruptcy court permitted pursuant to § 105 to *sua sponte* appoint trustee), *cert. denied,* — U.S. ——, 117 S.Ct. 69, 136 L.Ed.2d 29 (1996); *In re Busy Beaver Bldg. Ctrs., Inc.,* 19 F.3d 833, 841 (3d Cir.1994) (holding that bankruptcy court has duty, pursuant to § 105 and notwithstanding the absence of objections, to review fee applications); *Chinichian v. Campolongo (In re Chinichian),* 784 F.2d 1440, 1442–43 (9th Cir. 1986) (upholding bankruptcy court's *sua sponte* revocation of earlier confirmation order despite language of § 1330 ("on request of a party in interest")); 2 Colliers ¶ 105.01.

 Section 105(a) aptly has been described as a "codification" of the bankruptcy court's inherent power to issue orders in aid of its jurisdiction. *In re Charles & Lillian Brown's Hotel, Inc.,* 93 B.R. 49, 54 (Bankr. S.D.N.Y.1988) (citing *In re Amtol Corp.,* 57 B.R. 724, 726 (Bankr.N.D.Ohio 1986)); Cecelia N. Anekwe, *Responsible Officers get Green Light at the Intersection of the Tax and Bankruptcy Codes; Bankruptcy Code Section 105 can be Used to Order the IRS to Apply Debtor Tax Payments to Trust Fund Taxes,* 21 Seton Hall L.Rev. 868, 868 (1991).

 Remedial orders that a court may permissibly enter under § 105(a)'s aegis are diverse.[7] But the discretion and authority

---

6. 11 U.S.C. § 105(a) provides:
The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

7. *See. e.g., In re Volpert,* 110 F.3d at 501 (imposition of sanctions); *Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.),* 77 F.3d 278, 284–85 (9th Cir.1996) (imposition of sanctions against debtor's principal who, although neither a party nor an attorney, controlled the debtor and "abused the bankruptcy process in bad faith"); *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman),* 25 F.3d 356, 360–61 (6th Cir.1994) (eighteen-month stay of

that § 105 vest in the bankruptcy court are not unbridled. The court may not appoint itself "a roving commission to do equity" in a fashion inconsistent with other provisions of the Code, *Feld v. Zale Corp. (In re Zale Corp.),* 62 F.3d 746, 760 n. 42 (5th Cir.1995) (quoting *United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986)), or with fundamental precepts of due process. *In re Wildman,* 793 F.2d 157, 159–60 (7th Cir.1986). *See also Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Management Inc.),* 4 F.3d 1329, 1334 (5th Cir.1993) (section 105 orders must be issued in a manner consistent with the Bankruptcy Code); *In re Plaza de Diego Shopping Center, Inc.,* 911 F.2d 820, 830–31 (1st Cir.1990) (bankruptcy court's equitable jurisdiction must not be employed in ways inconsistent with the "commands of the Bankruptcy Code").

### 5. The November 6 Order.

#### a. An enforcement measure?

If the November 6 order was entered to "enforce" or "implement" the 1993 plan's confirmation, it must be vacated for at least two reasons. First, the bankruptcy court was without jurisdiction to enter an order "enforcing" the 1993 plan's terms. Second, even if jurisdiction existed, the order was entered without providing Roffman notice and a hearing.

#### (i) Jurisdictional concerns.

Although the parties have not briefed jurisdictional issues, *see In re DN Assocs.,* 165 B.R. 344, 346 n. 7 (Bankr.D.Me.1994) (as court of limited jurisdiction bankruptcy court must consider and confirm jurisdiction before proceeding to decision), we address it as one reason why the November 6 order fails as an attempt to enforce the order confirming ROPT's 1993 plan.

Sun Life and ROPT agree that the 1992 case was closed long before the 1996 case commenced. Assuming that the 1993 plan and its confirmation order effectively re-

served bankruptcy court jurisdiction over disputes such as that among ROPT, Sun Life, and SAR (Appellees' Appendix at 42), *e.g., Gray v. Polar Molecular Corp. (In re Polar Molecular Corp.),* 195 B.R. 548, 553–55 (Bankr.D.Mass.1996) (discussing principles of bankruptcy courts' retention of jurisdiction following confirmation and "substantial consummation" of chapter 11 reorganization plans); *In re DN Assocs.,* 165 B.R. at 347–48 (recognizing significance, in determining question of jurisdiction following confirmation of chapter 11 plan, of confirmation order's express retention of particular dispute); *In re Bankeast Corp.,* 132 B.R. 665 (Bankr. D.N.H.1991) (confirming proposed chapter 11 plan with narrower jurisdiction retention clause than that advanced by plan proponents), reopening the case would nevertheless be an essential prerequisite to exercising that jurisdiction. *Cf. Donaldson v. Bernstein,* 104 F.3d at 551–52 (bankruptcy court had jurisdiction over adversary proceeding because, prior to its initiation, court reopened previously closed bankruptcy case); *Porges v. Gruntal & Co. (In re Porges),* 44 F.3d 159, 162–63 (2nd Cir.1995) (analogizing bankruptcy court's retention of jurisdiction over pending adversary proceeding following dismissal of main case, to district court's jurisdiction over pendent state claims following dismissal of all federal claims, held that "decision whether to retain jurisdiction should be left to the sound discretion of the [trial] court.").

At no time prior to November 6, 1996, was ROPT's 1992 case reopened. Thus, the bankruptcy court lacked jurisdiction to enter an order enforcing the 1993 plan's terms.

#### (ii) Due process concerns.

Whether or not the bankruptcy court had jurisdiction to enforce the 1993 plan on November 6, 1996, its summary action in ordering Roffman to repay money to the estate did abridge his rights to procedural due process.

---

court's grant of a discharge of debtors' student loan obligations), *cert. denied,* 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995); *American Imaging Servs., Inc. v. Eagle–Picher Indus., Inc. (In re Eagle–Picher Indus., Inc.),* 963 F.2d 855, 860–62 (6th Cir.1992) (entry of preliminary in-

junction barring shareholder litigation); *In re G.S.F. Corp.,* 938 F.2d 1467, 1475–77 (1st Cir. 1991) (issuance of permanent injunction against further litigation to protect previously entered judgment).

The only issue noticed for hearing on November 6 was the question whether the debtor would be granted permission to use Sun Life's cash collateral. During the course of the hearing, Sun Life moved orally for a Chapter 11 trustee's appointment.[8] But at no time before the court's order entered was Roffman apprised of the possibility that the hearing would result in an order compelling him to "return" $84,500.00 to ROPT's bankruptcy estate. Entry of such an order, without meaningful prior notice and an opportunity to be heard on the question of personal liability, was fundamentally unfair, amounting to a denial of due process.[9] Procedural due process requires, "at a minimum ... that deprivation of life, liberty or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950).[10]

In ordering Roffman to repay $84,500.00 to ROPT's estate, the bankruptcy court bypassed Code provisions and related procedural rules designed to govern attempts to recover from third-parties, including insiders,[11] assets properly belonging to, or properly to be brought within, the bankruptcy estate. *See, e.g.,* § 542 (turnover of estate property); § 543 (turnover of property by custodian); § 544 (trustee avoiding powers); § 547(b) (preference avoidance); § 548 (fraudulent transfer); § 549 (postpetition transfer avoidance). Resort to the foregoing provisions requires (with exceptions not applicable here) an adversary proceeding, in essence a separate lawsuit, characterized by an exchange of pleadings, service of process, a period of discovery, and the opportunity for trial.[12] *See* Fed. R. Bankr.P. 7001(1), *et seq.* Roffman was entitled to the notice and hearing that adherence to those procedures provides.[13]

**8.** The court's order granting Sun Life's oral motion and appointing a trustee is not challenged on appeal.

**9.** Our discussion proceeds on the assumption that the November 6 order operated as a money judgment. The order's character is elusive. It is phrased as a mandatory injunction, requiring Roffman to "return" funds to the estate by a date and time certain. *Compare Bogosian v. Woloohojian Realty Corp.,* 923 F.2d 898, 903–04 (1st Cir.1991) (finding that court's order requiring party to pay money during pendency of suit was mandatory injunction because it (i) was directed at a party, (ii) ordered the party to take a particular action, (iii) was more than "minimally coercive," (iv) had serious consequences, and (v) was enforceable through contempt) with *Cournoyer v. Town of Lincoln (In re Cournoyer),* 43 B.R. 354, 359 (Bankr.D.R.I.1984) (considering that money judgments are intended to provide compensation for past injuries where payment of money would satisfy creditor's objective), *aff'd in part rev'd in part on other grounds,* 53 B.R. 478 (D.R.I.1985), *aff'd,* 790 F.2d 971 (1st Cir.1986). Its function is more accurately that of a money judgment—the order is obviously not for an accounting and there is no record evidence of a discrete, uncommingled fund as to which an injunctive order might properly operate. In the end, the order's character is not decisive. All that we say about the necessity of procedural due process pertains to the issuance of injunctions as much as it does to entry of money judgments.

**10.** Procedural due process is not an inelastic concept, *see Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 162–63, 71 S.Ct. 624, 643–44, 95 L.Ed. 817 (1951) (Frankfurter, J.,

concurring), and there may be occasions where a prompt, post-deprivation hearing may suffice. *See Porter v. DiBlasio,* 93 F.3d 301, 305–06 (7th Cir.1996) (recognizing that although there is a presumption that a person is entitled to notice and a hearing prior to property deprivation, "a predeprivation hearing is not required in all circumstances."); *see also Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 615–18, 94 S.Ct. 1895, 1904–06, 40 L.Ed.2d 406 (1974) (distinguishing valid Louisiana sequestration procedure from earlier deprivation procedures found to be violative of Due Process Clause in part by the availability of immediate post-deprivation hearing). Here, no meaningful notice or hearing whatsoever accompanied entry of the court's order.

**11.** As to ROPT Roffman was unquestionably an "insider" within the meaning of the Code. *See* §§ 101(31)(C)(v), (E), (F); 101(2).

**12.** Entry of injunctive relief, too, *see supra* n. 10, requires an adversary proceeding. Fed. R. Bankr.P. 7001(7).

**13.** An order requiring the *debtor* to turn estate property over to the trustee can be entered without initiating an adversary proceeding, Fed. R. Bankr.P. 7001(1). But Roffman is not the debtor. The record discloses no adjudication, prior to or contemporaneous with the November 6 order, establishing that he, ROPT, and/or SAR would in law be considered one and the same. *Cf. Birbara v. Locke,* 99 F.3d 1233, 1239–41 (1st Cir.1996) (discussing factors for courts to consider when determining whether to "pierce corporate veil").

The appellees argue that during the course of the November 6 hearing, ROPT's counsel "admitted" for Roffman as well as for ROPT, that $84,500.00 had wrongfully been diverted from the debtor to Roffman and that it must be returned. A fair reading of the November 6 hearing transcript belies the contention. Certainly, debtor's counsel consulted extensively with Roffman, debtor's principal, concerning cash collateral and trustee issues. Certainly, in an effort to stave off appointment of a trustee and to obtain cash collateral authority, ROPT offered to see that the funds were restored to the estate. But the notion that Roffman might have, in effect, an $84,500.00 money judgment entered against him summarily was completely absent from the context in which those discussions proceeded and those representations were made. It would compound the unfairness manifestly to say that ROPT's counsel (impermissibly) [14] served as Roffman's counsel, and made admissions binding on Roffman personally, during the course of a hearing before which Roffman was provided no hint that he would have need of personal representation.[15]

### b. An order for sanctions?

■ One might also consider the November 6 order as a sanction imposed against Roffman as a person who, although neither a party nor an attorney, controlled or orchestrated a pattern of abusive bankruptcy filings and who manipulated the process for personal gain. Although § 105's powers are sufficiently broad to sustain such an order, *see In re Rainbow Magazine, Inc.*, 77 F.3d at 284, it does not trump due process's essential requirements of fair notice and an opportunity to be heard. *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2nd Cir.1997) ("Due process requires that courts provide notice and opportunity to be heard before imposing any kind of sanctions."); *In re Wildman*, 793 F.2d at 159–60. *See generally*, Russell A. Eisenberg & Francis Gecker, *Due Process and Bankruptcy: A Contradiction in Terms?*, 10 Bankr.Dev. J. 47 (1993–94).

### *Conclusion*

Section 105(a) provides the bankruptcy court broad power to enforce its orders and to remedy abuses. But the statute's substantial power must not be brought to bear in peremptory fashion. The court's invocation of § 105(a) must be deliberate, with careful consideration of the parties' rights in the specific bankruptcy context and their overarching rights to due process.

Here, the bankruptcy judge smelled a rat. She acted decisively to chase it, thereby preserving the case's integrity and advancing the chance of an appropriate outcome. But when she also ordered Roffman to repay $84,500.00 to the estate forthwith, she denied him the day in court to which he was entitled.[16]

For the reasons set forth above, the bankruptcy court's order of November 6, 1996, is *VACATED.*

---

**14.** *See* § 327(a) (debtor-in-possession's attorney must be "disinterested" and may not represent any interest that is "adverse to the estate").

**15.** Roffman's comments during the November 6 hearing, although addressed to the issue whether a trustee would be appointed, articulate at least a colorable defense to the claim that $84,500.00 was looted from ROPT without any justification. (11/6 Trans., Appellant's Appendix at 24–25.)

**16.** We do not address, and do not intend in any way to intimate, our view whether Roffman (or SAR) could prevail against a properly instituted adversary action seeking to recover the $84,500.00 for ROPT's estate.