**In re C.R. AMUSEMENTS, LLC d/b/a Rocky Point Amusement Park, Debtor.**

**Acropolis Enterprises, Inc., Plaintiff,**

**v.**

**C.R. Amusements, LLC, d/b/a Rocky Point Amusement Park, James Callahan, Henry Vara, Rita DiMento & Francis DiMento, Defendants.**

**Bankruptcy No. 99–10154.**
**Adversary No. 99–1076.**

United States Bankruptcy Court,
D. Rhode Island.

Feb. 20, 2001.

John Gyorgy, Boisseau Leonard & Dean, Providence, RI, for Plaintiff.

Andrew Richardson, Boyajian, Harrington & Richardson, Providence, RI, for Chapter 7 Trustee.

Robert D. Wieck, Providence, RI, for James Callahan, Henry Vara, Rita DiMento and Francis DiMento.

Thomas A. Tarro, III, Warwick, RI, for James Callahan, Henry Vara, Rita DiMento and Francis DiMento.

## OPINION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

This is a dispute between certain shareholders and the majority shareholder/secured creditor of the Debtor. Acropolis Enterprises, Inc. ("Acropolis") filed a complaint against C.R. Amusements, LLC, the Debtor, to determine the extent, amount and priority of its lien against the Debtor's assets, which secure a loan in the amount of $8,339,518. On August 5, 1999, James C. Callahan, Henry Vara, Rita DiMento and Francis DiMento (hereinafter "Minority Shareholders"), filed a Motion to Intervene as defendants, which was granted on August 25, 1999.[1] After the Minority Shareholders entered the case as Defendants, they filed a Counterclaim against Acropolis, asking that the claim of Acropolis be equitably subordinated: (1) to the claims of the State of Rhode Island and the IRS for the payroll and sales tax liabilities assumed by the Debtor as part of a prior Chapter 11 case; (2) to the claim of James C. Callahan for his professional fees and expenses generated as a result of the

Debtor's failure to pay payroll and sales tax liabilities; and (3) to the interests of the Minority Shareholders up to $1,500,000, representing a return on their equity equal to the amount previously paid to Moneta Capital Corporation,[2] the predecessor-in-interest of Acropolis. Acropolis answered the Counterclaim and filed its own counterclaim against James Callahan. The Chapter 7 Trustee of C.R. Amusements reported that his issues with Acropolis were resolved and we proceeded to trial on the counterclaim of the Minority Shareholders versus Acropolis.

The main issues before the Court are: (1) whether Moneta breached its fiduciary duty to the Minority Shareholders; and (2) if so, should the secured claim of Acropolis Enterprises, Inc. be denied outright, or equitably subordinated on account of such breach. Based on the evidence and the applicable law, and for the reasons discussed below, both questions are answered in the negative.

## BACKGROUND

C.R. Amusements, Inc., is the owner of Rocky Point Amusement Park, a once popular waterfront landmark[3] consisting of 124 acres on Warwick Neck, Rhode Island. In the nineteen eighties the Park was owned by Captain Rocky, Inc. ("Captain Rocky") and other affiliated entities whose operations were financed by Bank of New England. In the early nineties, with Bank of New England experiencing its own financial difficulties, it called the Rocky Point note, although the loan was not in default. Scrambling to obtain other fi-

---

1. Callahan, Vara and the DiMentos are termed the "Minority Shareholders" as they hold a 49% equity interest, while Acropolis owns 51% of the Debtor's stock.

2. In the midst of this litigation, on February 2, 2000, Moneta was placed into receivership in the United States District Court for the District of Rhode Island, and the United States Small Business Administration ("SBA") was appointed Receiver. See United States v. Moneta Capital Corporation, CA No.

99–565–ML, (D.R.I. February 2, 2000). That filing afforded the SBA the opportunity to intervene here, but it has elected to remain on the sideline.

3. Time has not been kind to the property as an amusement park, and what was once the highest and best use of the property has taken a back seat to potential real estate development or public recreational use.

nancing, on September 26, 1991, Captain Rocky and its affiliates, Rocky Point Amusements, Inc. ("RPAI") and Kiddy Park, Inc. ("KPI"), entered into a lending relationship with Fairway Capital Corporation ("Fairway"), whereby Fairway loaned Captain Rocky $5,395,000 at 15.5% interest per annum, amortized over twenty years, but with a balloon payment due in five years. Under this new loan, Captain Rocky was required to pay interest of approximately $900,000 per year, and to accomplish this it would have to escrow $50,000 per week during the operating season. Callahan, Vara, and DiMento personally guaranteed the obligation to Fairway.

On March 31, 1994, the Fairway loan was assigned to Participation Services Corporation, an entity created and controlled by Arnold Kilberg, to service the loan. Mr. Kilberg was the president of both the assignor and the assignee entities.

On November 16, 1994, after defaulting on obligations to Fairway, and under threat of foreclosure, Captain Rocky, RPAI and KPI filed separate Chapter 11 cases in Worcester, Massachusetts, which eventually were consolidated for all purposes. At that time 100% of the shares of Captain Rocky, Inc. were owned by DiMento, Callahan, and Vara, and Captain Rocky owned 100% of the shares of the affiliated companies. The goals of DiMento, Callahan, and Vara, according to Callahan, were to emerge free of their personal guarantees of the original Fairway Capital loan, retain some equity interest in the park, and eliminate their personal liability on unpaid sales and payroll tax obligations.

In late spring 1995, after unsuccessful attempts to obtain concessionaires to operate the park, an agreement was reached between Captain Rocky, Arnold Kilberg, and Moneta[4] to submit a joint plan of reorganization. The parties entered into a Letter Agreement which essentially was the reorganization plan that would be confirmed by the Worcester bankruptcy court. The Letter Agreement provided: (1) Moneta would acquire the Fairway Capital loan which was being serviced by Participation Services; (2) all unpaid interest, legal fees and late charges due under the original Fairway loan would be capitalized and added to the Moneta loan; (3) the Moneta loan would be due in full five years from the effective date of the plan; (4) a new limited liability company would be created, to which all of the Rocky Point assets would be transferred free of all liens except the Moneta mortgage, prior liens of record and the property tax lien; (5) Moneta would own 51% of the Common Membership Interest of the new company, and Callahan, Vara, and DiMento would collectively own 49% of the Common Membership Interest; (6) Moneta would receive a $1,500,000 Nonvoting Preferred Membership interest in the new company; and (7) while their personal guarantees would be released, Callahan, Vara and DiMento would remain jointly and severally liable to the new company for any payroll and sales tax liability paid by the new company on behalf of the former company.

On October 18, 1995, the bankruptcy court in Worcester confirmed the Joint Plan of Reorganization, under which all of the assets of Rocky Point were transferred to C.R. Amusements, LLC. Pursuant to the plan, C.R. Amusements was to begin the task of finding suitable ride, food, and game concessionaires who would agree to pay at least 20% of their gross revenues from operations to C.R. Amusements. Callahan, who had attempted this task unsuccessfully prior to the submission of the Joint Plan of Reorganization, spearheaded this second effort, as well. It is the Minority Shareholders' position that Moneta/Kilberg hampered Callahan's efforts by not cooperating and by unreasonably withhold-

4. Arnold Kilberg is the Investment Advisor to Moneta and its former president, and he is the 92% shareholder of Northeast Capital Profit Sharing Trust which owns 100% of the shares of Moneta. He was also the Investment Advisor to Fairway Capital Corporation, the original lender to Rocky Point.

ing their consent to engage certain concessionaires. According to the Minority Shareholders, Moneta never intended to operate the amusement park, but secretly planned to develop the land into a large residential waterfront community. Moneta's scheme, say the Minority Shareholders, was to financially cripple C.R. Amusements so that it would be forced to default on its loan. Moneta would then acquire the property at foreclosure, continue developing the property, and retain all financial gains for itself. The Minority Shareholders argue that Moneta's actions as a 51% shareholder of C.R. Amusements constitute a breach of its fiduciary duty to them.

Predictably, Callahan's efforts to obtain concessionaires failed, leaving C.R. Amusements with very little cash flow from operations, so in late winter 1996, it was decided to sell the rides and equipment that spring. The Minority Shareholders allege: (1) that this was a unilateral, pre-planned decision by Moneta to change the plan from running an amusement park, to disposing of the rides and developing the land; (2) that Moneta insisted that from the sale proceeds of the rides it be paid $1.5 million to redeem its Non-voting Preferred Membership interest, five years earlier than originally agreed; (3) that they were not involved in this decision, but then curiously, they point to Paragraph 3.1 of the Operating Agreement which provides that Moneta had authority to sell the rides, with or without their consent. *See* Exhibit B, ¶ 3.1.[5] On January 30, 1996, C.R. Amusements entered into a contract with Norton Auctioneers ("Norton"), and Norton scheduled an auction of the rides and equipment to be held on April 16 and 17, 1996. Absent from the Minority Shareholder argument that they had no input regarding the decision to sell the rides is the fact that on January 2, 1996, they had entered into the letter agreement with Moneta providing *inter alia* for liquidation of the assets of C.R. Amusements and the payment to Moneta of $1.5 million from the proceeds of the sale. *See* Exhibit F.

Two events occurred during the auction which were the focus of much attention during the trial of this matter. First, just prior to the sale, several pieces of restaurant equipment valued at approximately $300,000 were removed from the auction. The Minority Shareholders contend that the equipment was removed by Kilberg without their input or approval, and that the decision to remove the equipment from the auction damaged C.R. Amusements in that they lost the proceeds from the sale of said equipment, and also were charged an auctioneer's commission of 8% and a buyer's premium of 5%, for a total of $39,000, on equipment that was never sold.

The second disputed auction event was the purchase of $693,650 of assets by C.R. Amusements, from itself. An individual named Timothy DelGiudice, purportedly on behalf of C.R. Amusements, was the successful bidder on several items, including the Flume Ride for $450,000. The Minority Shareholders claim that DelGiudice worked for Moneta and was submitting bids at the direction of Arnold Kilberg. The Flume Ride was sold later the same day by C.R. Amusements to the second highest bidder for $250,000. Accounting for commissions and the loss on the Flume Ride, these actions cost C.R. Amusements in excess of $307,000.[6] *See* Exhibit BB

---

**5.** The section states:

> The business affairs of the Company shall be managed exclusively by its Board of Managers [Moneta]. The Board of Managers shall direct, manage and control the business of the Company to the best of its ability and shall have full and complete authority, power and discretion to make any and all decisions and to do any and all things which the Board of Managers shall deem to be necessary to accomplish the business and objectives of the Company, subject to the provisions of Subsection 3.3(f)

> Exhibit B, Operation Agreement, p. 6, ¶ 3.1.

**6.** The eight percent commission on purchases of $693,650 is $55,492, plus the 5 percent buyer's premium ($34,682), plus the net loss

Sale Consummation. The Minority Shareholders argue that such flagrant conduct by Moneta requires the subordination of $1.5 million of Moneta's claim to the Minority Shareholders' interests.

Moneta's version of what transpired is radically different from that of the Minority Shareholders. Moneta: (1) denies any knowledge that DelGiudice was purchasing items at the auction for the benefit of C.R. Amusements, and states that it was shocked to discover that C.R. Amusements purchased the Flume Ride from itself for $450,000; (2) Moneta claims that DelGiudice worked for Henry Vara, that he was bidding at Vara's behest, and that it was Vara who wanted to keep the park together so he could operate the Rocky Point Family Fun Fair that summer.

Proceeds of the auction totaled $3,049,050, from which the City of Warwick was paid $600,000 for delinquent real estate taxes and from which Moneta received $1,500,000 pursuant to the Letter Agreement of January 2, 1996. After disbursement of these items and the auction expenses of Norton, C.R. Amusements was left with virtually no cash.

In the months following the auction C.R. Amusements, together with Moneta, moved forward on its alternate plan to develop the Rocky Point real estate. The engineering firm of Gordon Archibald, Inc. ("GAI") was retained by Moneta to flag wetlands and coastal features, perform field surveys and prepare a final constraint map of the site. Between January 1996 and June 1997, Joseph Longo [7] and Arnold Kilberg had ongoing discussions regarding the proposed development with representatives of the City of Warwick. They also hired Attorney Kevin McCarthy to help foster negotiations with the City to encourage the development of the site. GAI completed its services in June 1997.

On May 21, 1997, after C.R. Amusements defaulted in mortgage payments and the failure of the Minority Shareholders to make any further capital contributions, a Notice of Foreclosure was sent from Moneta to C.R. Amusements, scheduling a foreclosure sale for July 3, 1997. The Minority Shareholders sought a temporary restraining order from the Providence County Superior Court, and on July 3, 1997, Judge Silverstein denied the request and entered an order allowing the foreclosure to proceed. Thereafter, Callahan filed an involuntary Chapter 11 Bankruptcy Petition against C.R. Amusements in Worcester, Massachusetts. This proceeding was later dismissed but Callahan was successful in averting that foreclosure sale, as well.

On December 10, 1997, Moneta transferred and assigned its loan and security documents back to Participation Services. Then on February 23, 1998, Participation Services transferred and assigned the same loan and security documents to Acropolis Enterprises, Inc. On March 18, 2000, Acropolis sent a new Notice of Foreclosure to C.R. Amusements and the Minority Shareholders sought to enjoin that foreclosure by placing C.R. Amusements into state court receivership, wherein Justice Patricia Hurst of the Kent County Superior Court enjoined Acropolis from proceeding with foreclosure. After a state court receiver was appointed, on January 14, 1999, Arnold Kilberg, as manager of Moneta Capital Corporation, the majority owner of C.R. Amusements, Inc., filed the instant voluntary Chapter 7 Petition. The parties agreed that jurisdiction was proper in this Court, and this litigation ensued shortly thereafter. Prior to Moneta itself being petitioned into federal court receivership, the Chapter 7 Trustee and Acropolis had reached an agreement as to the substance of Acropolis' initial Complaint, and this trial proceeded on the Minority

on the resale of the Flume Ride ($200,000), plus the commission paid upon the resale of the Flume ($17,500), equals $307,674.

7. Joseph Longo was the President of C.R. Amusements and the President of Moneta.

Shareholders' Counterclaim, as well as on the Moneta/Acropolis Counterclaim against James Callahan on his personal guaranty of the Moneta loan.

## DISCUSSION

*The Remedy–Equitable Subordination:*

▮ The Minority Shareholders seek equitable subordination under Section 510(c)(1) of the Bankruptcy Code, which provides that:

> . . . after notice and a hearing, the court may-
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest . . .

11 U.S.C. § 510(c)(1). This section authorizes the subordination of *claims to other claims* or *interests to other interests,* but "[i]ts language does not extend to treatment of interests vis a vis claims because . . . equity interests are already subordinate to claims." *Town & Country Corp. v. Hare & Cor. (In re Town & Country Co.),* BAP No. 99–030, slip op. at 16 (B.A.P. 1st Cir. July 10, 2000). The court "will not import some other interpretation to § 510(c) when its language is clear and unambiguous on its face." *Id.* "It is 'a fundamental canon that statutory interpretation begins with the language of the statute itself.'" *Id.* at 16–17, *quoting Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 557–58, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990).

Indeed, the legislative history clearly supports the plain reading of Section 510(c). In enacting the statute, Congress stated: "As a matter of equity, it is reasonable that a court subordinate claims to claims and interests to interests." 124 Cong. Rec. H 11,095 (Sept. 28, 1978); S

17,412 (Oct. 6, 1978). Here, the Minority Shareholders hold equity interests which they acquired with full knowledge of the enormity of the secured debt, and the statute simply does not permit them to equitably subordinate the claim of a secured creditor to their equity interests. Under the plain language of the statute, equitable subordination is not a permissible remedy for the Minority Shareholders.

When the First Circuit addressed equitable subordination in the case of *Boyajian v. DeFusco (In re Giorgio),* 862 F.2d 933, 939 (1st Cir.1988),[8] Justice Breyer explained Section 510 as follows: "the bankruptcy court may equitably subordinate those debts, the creation of which was inequitable *vis-a-vis other creditors.*" (Emphasis added). Again, the Minority Shareholders here hold equity interests—not claims.

▮ To overcome this statutory obstacle, the Minority Shareholders urge that the "inherent equitable power" of the Court allows such relief, and they rely on Section 105 in support of expanding Section 510(c) beyond its stated limits. They also suggest, in response to the proposed findings of fact and conclusions of law submitted by Acropolis, several "alternatives" to equitable subordination, i.e., that the lien held by Acropolis be transferred to the estate under § 510(c)(2), and then subordinated to their interest. And finally, they seek the imposition of a constructive trust or equitable mortgage. However, as Acropolis correctly points out, these proposed remedies fail for the reason that none were requested in the pleadings, identified in the Joint Pretrial Order, or briefed by either side prior to the hearing on the merits. Additionally, to grant such relief under this Court's Section 105 equitable powers would fly in the face of the statutory mandate of Section 510(c), that claims can be subordinated to claims and

---

8. This Court is quite aware of the *Giorgio* result, as it was our ruling that was reversed

by the District Court and the First Circuit.

interests to interests. To mix and match is not authorized here.

> Remedial orders that a court may permissibly enter under § 105(a)'s aegis are diverse. But the discretion and authority that § 105 vest in the bankruptcy court are not unbridled. The court may not appoint itself "a roving commission to do equity" in a fashion inconsistent with other provisions of the Code, *Feld v. Zale Corp.* (*In re Zale Corp.*), 62 F.3d 746, 760 n. 42 (5th Cir.1995) (*quoting United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986)), or with fundamental precepts of due process. *In re Wildman,* 793 F.2d 157, 159–60 (7th Cir. 1986). *See also Chiasson v. J. Louis Matherne & Assocs.* (*In re Oxford Management Inc.*), 4 F.3d 1329, 1334 (5th Cir.1993) (section 105 orders must be issued in a manner consistent with the Bankruptcy Code); *In re Plaza de Diego Shopping Center, Inc.,* 911 F.2d 820, 830–31 (1st Cir.1990) (bankruptcy court's equitable jurisdiction must not be employed in ways inconsistent with the "commands of the Bankruptcy Code").

*Roffman v. Butler* (*In re ROPT Ltd. P'ship*), 209 B.R. 144, 149–50 (1st Cir. BAP 1997) (footnote omitted).

Minority Shareholder James Callahan argues separately that he in fact is a creditor, on account of legal and other professional services he rendered in opposing and negotiating with taxing authorities on claims that should have been paid by C.R. Amusements under the confirmed plan of reorganization, and he requests that we subordinate Acropolis's secured claim to any "claim" he has for professional services rendered. In the same vein, the Minority Shareholders argue that Acropolis's claim ought to be subordinated to the taxing authorities' claims because Moneta/Acropolis did not live up to the terms of the confirmed plan of reorganization or the letter agreement of September 17, 1995 (Exhibit A) by paying said tax claims.

Initially, we note that Mr. Callahan has filed no claim in this case for professional fees or expenses, and that the bar date for filing such claims expired on December 28, 1999. Without a claim, there is nothing to subordinate under Section 510. But even putting this "minor technicality" aside, the tax claims and the corresponding professional fees are not the responsibility of the Debtor, C.R. Amusements, but are and always have been the personal responsibility of the Minority Shareholders, who became personally liable for the payroll and sales tax obligations at the time of the first Chapter 11 filing in Worcester.

The Minority Shareholders argue, nevertheless, that C.R. Amusements assumed these liabilities as part of the confirmed plan of reorganization, and relieved the shareholders of their obligations. This is incorrect. While there was confusing and conflicting testimony on this issue from both sides, one need look no further than the actual documents to resolve the issue. The Letter Agreement of September 17, 1995, which was the basis for the plan of reorganization, states:

> 1. . . .

>> (d) there will be no guarantors of the Moneta Loan, except that each member of the Ownership Group[9] will be jointly and severally liable to the Company for any Payroll Tax Liabilities as hereinafter defined paid by Company.

> . . .

> 3. . . . The Company *will not assume or be obligated for any indebtedness, obligations or liabilities of Debtors,*[10] the Ownership Group or any of them; however the Company will assume payroll

---

**9.** This term in used in the Letter Agreement to refer to Francis J. DiMento, James C. Callahan, and Henry D. Vara, Jr. *See* Exhibit A, Letter Agreement Dated September 17, 1995, p. 1.

**10.** This term is used in the Letter Agreement to refer collectively to Captain Rocky, Inc., Rocky Point Amusements, Inc., and Kiddy Park, Inc. *See* Exhibit A, Letter Agreement Dated September 17, 1995, p. 1.

and sales tax liabilities *of the Debtors* (the "Payroll Tax Liabilities") as long as such payroll and sales tax liabilities do not exceed $400,000 and so long as the Company is permitted to pay them in substantially equal monthly payments over a period of at least six years.

Exhibit A, Letter Agreement Dated September 17, 1995, pp. 1–2. C.R. Amusements only assumed the payroll and sales tax liabilities of the Debtors, not the Ownership Group. The assumption is specific in its terms, and the evidence does not establish that C.R. Amusements reached an agreement with the taxing authorities to reduce the tax liability to a sum less than $400,000 with equal payments over six years. Furthermore, even if C.R. Amusements had reached such an agreement with the taxing authorities, and had in fact paid these liabilities, under the Letter Agreement the Ownership Group is required to pay these sums back to C.R. Amusements, and the Minority Shareholders personally guaranteed such payments. Under *any* scenario, the Minority Shareholders remain personally liable on these tax debts, and there is no basis in law or equity to subordinate Acropolis's claim to the personal tax obligations of the Minority Shareholders or to any professional fees incurred by Mr. Callahan on account of his *personal* tax liability.[11]

 Finally, for the sake of argument only, even if the Minority Shareholders could legally seek the remedy of equitable subordination, they fail on the substance of the request because they have not established that Acropolis/Moneta acted inequitably. The First Circuit, in adopting the standard set by the Fifth Circuit in *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir.1977), summarizes the doctrine of equitable subordination as follows:

> To subordinate a claim one must find that the circumstances satisfy the following three conditions:

> (1) The claimant must have engaged in some type of inequitable conduct.

> (2) The misconduct must have resulted in injury to creditors or conferred an unfair advantage on the claimant.

> (3) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

*In re Giorgio*, 862 F.2d at 938–939. I have not located a specific definition of inequitable conduct under the first part of the test. However, courts have recognized three categories of conduct which is considered to be inequitable: "(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *In re Fabricators, Inc.*, 926 F.2d 1458, 1467 (5th Cir.1991) *citing In re Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206, 212 (5th Cir.1983).

 The Minority Shareholders argue that Moneta breached its fiduciary duty to them as minority shareholders, that this breach conferred an unfair advantage on Moneta, causing them injury, and that Moneta engaged in inequitable conduct such that subordination of Moneta's claim is appropriate. True—under Rhode Island law, Moneta, as the majority shareholder, owed a fiduciary duty to the Minority Shareholders. The Rhode Island Supreme Court held recently that "when the shareholders in a less-than-thirty-shareholder corporation act among themselves as partners in a business venture for mutual profit or loss, the law ought to treat them as fiduciaries." *A. Teixeira & Co., Inc. v. Teixeira*, 699 A.2d 1383, 1387 (R.I.1997). The Court found that "on the basis of the small number of shareholders in plaintiff corporation, the active participation by these shareholders in management decisions, and their close and intimate working relations, that the

---

**11.** As a final comment on this issue, we agree with Acropolis's argument that the Minority Shareholders lack standing to raise the issue of equitable subordination with regard to the holders of tax claims.

shareholders of plaintiff corporation, by acting as if they were partners, thus assumed a fiduciary duty toward one another and their corporation." *Id.* The Minority Shareholders reference three items which constitute breaches of fiduciary duty by Moneta: (1) Moneta's interference with Debtor's efforts to obtain concessionaires; (2) improprieties during the auction of rides and equipment; and (3) the acceleration of the redemption of the $1,500,000 Non-voting Preferred Membership interest ("Usury Transaction").

For the reasons discussed below, I find that on each of these issues the Minority Shareholders have failed to prove a breach of fiduciary duty:

*Efforts to Obtain Concessionaires:*

After confirmation of the joint plan of reorganization, all parties agreed that in order for the park to continue to operate as an amusement park, suitable rides, food and game concessionaires had to be obtained immediately. The third party concession/service agreements were to be the Debtor's main source of cash flow to provide the income necessary to pay the debt service, and if these efforts failed, liquidation was inevitable. The Minority Shareholders allege that with liquidation in mind, Moneta intentionally interfered with and frustrated their efforts. They base this claim on the failure of Kilberg and Longo to attend a meeting in South Carolina with Amusements of America, owned by the Vivona brothers. Callahan scheduled a meeting with the Vivonas, but Kilberg and Longo did not attend because they were out of the country on business at the time. Callahan testified that he attended the meeting with the Vivonas and gave a presentation, but there is no evidence that the Vivonas and C.R. Amusements reached an agreement, or that Callahan attempted to arrange other meetings. Kilberg testified that for the park to be profitable, an arrangement was required which would pay the park 20% of the gross profits, and that Vivona was not interested in such a deal. Kilberg reached this conclusion based upon a meeting of his own with one of the Vivonas at Buddy's Restaurant in September 1995. He described the situation as the Vivonas being only slightly interested in Rocky Point, and that "Vara was chasing a dead lead."

Kilberg also testified that he and Longo met and had discussions with other potential concessionaires, including those suggested by Callahan.[12] There were several meetings and a draft term sheet with Boston Concessions, under which C.R. Amusements was required to get all concessionaires in place for Boston Concessions to even continue negotiations. However, there was no final agreement, as C.R. Amusements never reached agreements with a rides operator, nor was there an agreement for games. The Court finds that there was no breach of fiduciary duty by Moneta on the ground that Moneta interfered with C.R. Amusements' efforts to obtain concessionaires to operate the park. Messrs. Callahan, Kilberg and Longo all tried to find concessionaires, and their failure to do so was not due to interference by Moneta/Kilberg. It is more likely that such a deal was a virtual impossibility, given that the park was so well worn and in such serious financial straights.

*The Auction:*

When it became clear that the time for signing up concessionaires had run out, the decision was made to sell the rides and equipment at the park during the spring of 1996. On January 2, 1996, the Minority Shareholders agreed to sell the rides and equipment "immediately" and to allow

---

12. The evidence is that Moneta investigated potential food concessionaires even beyond Callahan's suggestions. Kilberg testified that he contacted the Marriott Corporation, Johnson & Wales University, and a company called Fame. While none of these contacts resulted in an agreement, they suggest that Moneta was willing to and did participate in the search for concessionaires.

Moneta to redeem its $1,500,000 Non-voting Preferred Membership interest upon the sale, instead of on the fifth anniversary of the Moneta Loan. In return, C.R. Amusements would receive an interest credit on the balance of the Moneta loan of 15.5% calculated on the $1.5 million from the date of redemption until the date the loan is paid off. *See* Exhibit F, Letter Agreement of January 2, 1996. The Minority Shareholders argue that they were somehow coerced into entering into this agreement and that Moneta, by forcing the sale of the rides and equipment and redeeming its $1,500,000 Non-voting Preferred Membership interest prematurely, breached its fiduciary duty to them.

The evidence does not support that contention. The Minority Shareholders, who engaged in arms-length negotiations with Moneta which led to the January 2, 1996 Agreement, were represented by counsel, Vincent DiMento, Esq., who advised them not to sign the January 2, 1996 Letter Agreement which paved the way for selling the rides and paying Moneta $1.5 million. But Callahan and Vara did not heed the advice of their colleague and counsel, and executed the Agreement (Exhibit F). Mr. Callahan at first testified that he did not agree to sell the rides and equipment, and that he signed the Agreement against his will. On cross-examination he recanted quite a bit, stating that he could not remember if he voiced any objection to the sale of the rides, and he never offered any evidence of coercion or undue influence. Additionally, the evidence is that Henry Vara and Moneta wanted to sell the rides and equipment, and their votes together equated to 76% of the company. Furthermore, Francis DiMento deferred to Henry Vara and if his vote is counted in favor of a

sale, that amounts to 88% of the company. In the absence of any evidence of coercion or undue influence, I find that the Minority Shareholders voluntarily agreed to the sale and the early payment to Moneta, as evidenced by their writings in Exhibit F. *See In re Meller v. Adolf Meller Company,* 554 A.2d 648 (R.I.1989) (the Rhode Island Supreme Court affirmed a lower court decision binding the heirs of a majority shareholder to a stock repurchase agreement and finding no breach of fiduciary duty by the other shareholders).

The Minority Shareholders assert that Moneta committed a further breach of its fiduciary duty when it removed the restaurant equipment and fixtures from the sale and "bought back" the flume and other rides. I find, based on the evidence, that Henry Vara was in fact responsible for removing the restaurant equipment from the sale and buying back the Flume Ride and other items, purportedly on C.R. Amusements' behalf.

I also find that the bidding on C.R. Amusements' property by Timothy DelGiudice was orchestrated by Vara and not Kilberg or anyone acting on Moneta's behalf. This bidding and removal of property was not known to Moneta, either through Kilberg or Longo, prior to the first day of the auction. This was confirmed by the secretary to Attorney McCarthy, Eleanor Jordan, who testified that the buy-back plan was purposefully kept secret from Kilberg. Jordan also confirmed that Attorney McCarthy gave instructions to Timothy DelGiudice regarding what items to purchase, and that DelGiudice was acting on behalf of Vara.[13] This testimony is reinforced by the testimony of Timothy DelGiudice himself, who

---

13. There is some question as to whether Attorney McCarthy was representing C.R. Amusements or Henry Vara during this time. McCarthy originally worked for Vara and it was Vara who introduced McCarthy to Arnold Kilberg and C.R. Amusements. While employed by C.R. Amusements, McCarthy was hired to negotiate with the City of Warwick regarding the future development of the Rock Point site. However, Vara testified that at this time McCarthy worked for Vara setting up the corporation which operated the Family Fun Fair, taking care of all publicity for the Fair, and handling legal issues that arose during the operation of the Fair. I find that regarding the auction and any instructions given to Timothy DelGiudice, McCarthy represented Henry Vara.

stated that Vara instructed him that there was no limit on his bid on the Flume Ride. The only evidence in contrast is by Callahan, who testified that DelGiudice told him during a phone conversation prior to the trial that he (DelGiudice) had received his instructions at the auction from Arnold Kilberg. DelGiudice denies that statement and insists that he was instructed by McCarthy. Henry Vara's testimony supports DelGiudice's version of the facts when he testified: "I authorized Kevin McCarthy to get someone to bid on the Flume, that's right." I resolve this conflicting evidence in favor of the Defendants, and find that Henry Vara was responsible for what transpired in this regard at the auction.

This finding as to what really happened at the auction is buttressed by the motives of the parties. Moneta had nothing to gain by removing items from the auction or by directing that C.R. Amusements buy back its own merchandise. C.R. Amusements had no cash with which to pay for the items and any such purchases would only reduce the net proceeds obtained from the sale. Moneta had a security interest in the property sold at auction, both as part of the assignment of the Fairway loan documents and as security for payment of the $1.5 million Preferred Membership Interest. Any reduction in the proceeds would reduce the amount Moneta would receive from the liquidation of its collateral, and so the allegations make no economic sense. In this regard I will take the equivalent of judicial notice that Arnold Kilberg would not do something that did not make economic sense for him.

On the other hand, the evidence is that Henry Vara operated the Rocky Point Family Fun Fair during the summer of 1996, for his own account. Longo testified that the Family Fun Fair was mentioned by Vara during his explanation to Kilberg as to why the Flume had been purchased by DelGiudice, and there is also evidence that Vara made a public announcement at the end of the auction that Rocky Point would reopen that season with the Family Fun Fair. Vara also testified that he used the Flume Ride during the Family Fun Fair. Here again, I find that Moneta did not breach its fiduciary duty to the Minority Shareholders during the auction.

*The Usurious Transaction:*

The Minority Shareholders argue that when one takes into account the $1.5 million payment received by Moneta from the sale of the rides and equipment, the loan is usurious. They argue that as such, the transaction is one that does not benefit the Debtor and confers an undue and unjust advantage on Moneta, resulting in a breach of its fiduciary duty to them. It is understood that the Minority Shareholders are not making a direct claim of usury because that claim would belong to the Chapter 7 Trustee of C.R. Amusements, and that unless such claim were abandoned, the Minority Shareholders lack standing to pursue the claim directly. The usury argument is merely being raised as part of the Minority Shareholders' overall attempt to demonstrate that Moneta breached its general fiduciary duty to them.

Initially, I cannot find that Moneta owed a duty to the Minority Shareholders of the Debtor corporation regarding the interest rate charged under the loan. Moneta is a creditor and all negotiations were conducted at arms length, between very business-savvy parties. Indeed, as a 51% shareholder in C.R. Amusements, Moneta is a party to the allegedly usurious agreement and assuming that such a duty exists, I find that the transaction is not usurious. Under the original loan documents, the stated interest rate is 15.5%. *See* Exhibit 16. The note further provides for a "default" rate of interest, however, there is no evidence that such a rate was ever applied to the loan in question. Under Rhode Island law:

> no ... corporation loaning money to or negotiating the loan of money for another ... shall, directly or indirectly, re-

serve, charge, or take interest on a loan, whether before or after maturity, at a rate which shall exceed the greater of twenty-one percent (21%) per annum or the alternate rate specified in subsection (b) of this section of the unpaid principal balance of the net proceeds of the loan not compounded, nor taken in advance, nor added on to the amount of the loan. R.I. Gen. Laws § 6–26–2(a) (West 2000).

To prove the loan usurious, the Minority Shareholders offered the testimony of John Evans of Financial Publishing Company, who testified that he made several calculations using the formula, Interest = Principal × Rate × Time (I=PRT). Based on his assumptions that the inception date of the Moneta loan was January 2, 1996, and that the $1.5 million payment is treated as a finance charge, he concluded that interest on the loan exceeds 21% and is therefore usurious. He concedes that if any of the variables change, such as the inception date of the loan or the fact that the $1.5 million is not a finance charge, then the transaction, in all likelihood, is not usurious.[14]

There are two problems with Mr. Evans' analysis. First, the date of the loan is September 26, 1991—four years earlier than Evans' assumption date. *See* Exhibit 16. When Moneta came into the picture after the first bankruptcy in late 1995, it did not loan any new money to the Debtor. Rather, the unpaid interest and expenses were re-amortized into the existing loan which was assigned to Moneta. Even the Minority Shareholders refer to the loan as commencing in 1991. *See* Exhibit F.

The second problem is treating the $1.5 million payment as a finance charge. As part of the 1995 reorganization, Moneta was given a $1.5 Million Non–Voting Preferred Membership Interest in the new company. This provision was agreed to by all of the Minority Shareholders and approved by the bankruptcy court in Worcester as part of the confirmation of the plan of reorganization. When the interest was redeemed early, all of the Minority Shareholders consented, notwithstanding their counsel's advice to the contrary. *See* Exhibit F and discussion *infra* at 533. But even if the usury statute is applicable, it excludes from the definition of interest any redemption of an equity interest. The statute states: "For purposes of this section, interest shall not be construed to include... consideration received for the redemption, sale, transfer, or other disposition of equity securities by a small business investment company licensed under the provisions of the United States 'Small Business Investment Act of 1958.'"[15] R.I. Gen. Laws § 6–26–2(c) (West 2000). The $1.5 million payment was to redeem an equity interest, and therefore not a finance charge, and Moneta did not breach any fiduciary duty owed to the Minority Shareholders on the ground that Moneta entered into a usurious transaction with the Debtor.

### CONCLUSION

For all of the foregoing reasons, I hold that: (1) equitable subordination is not legally appropriate in this case; (2) even if equitable subordination could legally be applied here, on the merits, the Minority Shareholders have not sustained their burden of proof. Accordingly, the Minority Shareholders' Counterclaim against Acropolis is DENIED and DISMISSED. Because no evidence was proffered regarding Acropolis's Counterclaims against James Callahan, the Counterclaim is DENIED and DISMISSED.

---

14. Evans made his assumptions without the benefit of performing an actual calculation, because he never figured the interest rate using an earlier inception date for the loan. He did state that if the $1.5 million payment was taken out of the equation, the loan was not usurious.

15. It is undisputed that Moneta is a small business investment company licensed under Small Business Investment Act.

Enter Judgment consistent with this opinion.